LEWELLYN, Internal Revenue Collector, v. PITTSBURGH, B. & L. E. R. CO.

SAME v. PITTSBURGH, M. & Y. R. CO.

(Circuit Court of Appeals, Third Circuit.   April 15, 1915.)

Nos. 1931, 1932.

1. INTERNAL REVENUE ☞9—CORPORATE EXCISE TAX—CORPORATIONS LIABLE —"DOING BUSINESS"—"NET INCOME."

Where railroad companies leased their railroads, rolling stock, and other property, and surrendered possession thereof to the lessee, and the lessee thereupon assumed and maintained entire control and operation of the roads, the lessors agreeing to maintain their corporate existence in order to hold title to the properties and to exercise their power of eminent domain in acquiring additional property when the lessee might so request and furnish the money therefor, and the lessee agreeing to pay the taxes and interest upon the bonded indebtedness of the companies, and to pay dividends to the lessors' stockholders at an agreed rate, the acquisition of property by the lessors by purchase and condemnation pursuant to the request and direction of the lessee, which property was paid for with money furnished by the lessee and was immediately delivered into the possession of the lessee and used by it in operating the roads under the terms of the leases, was not such a doing of business as made the lessors liable for the special excise tax imposed by Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, §§ 6300–6307), providing that every corporation organized for profit and engaged in business shall be subject to a special excise tax with respect to the carrying on or doing business by it, equivalent to 1 per cent. upon its entire net income over and above $5,000 from all sources, as corporate acts performed by a corporation in the exercise of its primary franchises, as the maintenance of its corporate existence, or which relate strictly to the internal affairs of the corporation and do not include the exercise of its secondary franchises, do not constitute "doing business" within the statute, and though the acts of purchasing and condemning property were both corporate and business acts, the corporations merely acquired the instrumentalities to do the thing and to carry on the business for which they were incorporated, and, moreover, "net income" imports a gross income, and the difference between the two implies the expenditure of income for some corporate purpose, as that of carrying on or doing the business for which the corporation is organized, and such corporations received no income from railroads operated by them, and expended none in the operation of railroads, or for any other purpose.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Doing Business; Net Income.]

2. INTERNAL REVENUE ☞9—CORPORATE EXCISE TAX—"ENGAGED IN BUSINESS"—"CARRYING ON BUSINESS"—"DOING BUSINESS."

Within Act Aug. 5, 1909, § 38, the expressions "engaged in business," "carrying on business," or "doing business" do not have different meanings, but separately or connectedly convey the idea of progression, continuity, or sustained activity, and "engaged in business" means occupied or employed in business, "carrying on business" does not mean the performance of a single disconnected business act, but means conducting, prosecuting, and continuing business by performing progressively all the

acts normally incident thereto, while "doing business" conveys the idea of business being done, not from time to time, but all the time.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Carry on Business; Engage.]

In Error to the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Two actions by the Pittsburgh, Bessemer & Lake Erie Railroad Company and by the Pittsburgh, McKeesport & Youghiogheny Railroad Company against C. G. Lewellyn, Collector of Internal Revenue for the Twenty-Third District of Pennsylvania. Judgments for plaintiffs, and defendant brings error. Affirmed.

E. Lowry Humes, of Pittsburgh, Pa., for plaintiff in error.

George E. Shaw, of Pittsburgh, Pa., for defendants in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. Against the plaintiff corporations, certain special excise taxes were assessed for the years 1910, 1911, and 1912. They were paid under protest, and after claims for their refund and abatement had been made and rejected these suits were brought to recover the amounts paid.

[1] The matter in controversy is whether a special excise tax, provided by section 38, Act Aug. 5, 1909 (36 Stat. 112), can legally be assessed against and collected from the plaintiff railroad corporations under the facts of these cases. The statute, under authority of which the taxes were assessed and collected, provides as follows:

"That every corporation * * * organized for profit * * * and *engaged in business* in any state * * * shall be subject to pay annually a special excise tax with respect to the *carrying on or doing business* by such corporation, * * * equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year."

The facts upon which the United States Commissioner of Internal Revenue acted in making the assessments, are as follows:

Upon different dates prior to the act of Congress of August 5, 1909, the Pittsburgh, Bessemer & Lake Erie Railroad Company and the Pittsburgh, McKeesport & Youghiogheny Railroad Company, corporations of the state of Pennsylvania, acting under authority of the Pennsylvania acts of April 23, 1861 (P. L. 410), and February 17, 1870 (P. L. 31), leased to the Pittsburgh & Lake Erie Railroad Company, for periods of 999 years, their main and branch lines of railroad and all rolling stock, equipment, and other property which they then owned or would thereafter acquire, whereupon the lessor companies surrendered, and the lessee company assumed, and has ever since maintained, the entire control and operation, as well as the possession, of the two leased roads. As rentals for the properties demised, the lessee company promised to pay the taxes, and to pay dividends at a certain rate upon

the capital stock and to pay the interest upon the bonded indebtedness of the two companies. The lessor companies, on the other hand, undertook to maintain their corporate existence in order to hold title to the properties leased, and to exercise their reserved power of eminent domain in acquiring additional property, when and as the lessee company might request and for which it would furnish the money.

The lessor companies maintained their corporate existence by annually electing boards of directors and corporate officials, and performed certain other corporate acts presently to be mentioned. They maintained no separate offices, employed no office force, paid no salaries, neither paid nor directly received rentals, kept no books of account or bank accounts, and received and disbursed no funds. Their taxes were paid by the lessee company directly to tax collectors, and the rentals in the form of dividends and interest, payable under the lease, were paid directly to their stockholders and to the trustees of the mortgages upon which their bonds were issued. It appears that during the periods for which the taxes in question were assessed the Pittsburgh & Lake Erie Railroad Company, the lessee, found it necessary or expedient in the operation of the leased roads to straighten and extend them, to which end it requested, and in fact directed, the lessor companies to acquire the necessary property either by purchase or by the exercise of their reserved power of eminent domain.

Properties in considerable number were purchased, and acquired by condemnation proceedings instituted and concluded by the lessor companies pursuant to resolutions by their boards of directors, proposed and passed in conformity with the statutes of Pennsylvania, but suggested in every instance by the lessee company and conducted under the direction of its officers. The costs and expenses were paid, and the consideration and condemnation money in all instances supplied, by the lessee company. While title was retained by the lessor companies, all properties, howsoever acquired, were immediately delivered into the possession of the lessee company, and were exclusively used by it in operating the roads under the terms of the leases.

The precise question presented is whether the bare acts of the plaintiff railroad companies in acquiring property by purchase and condemnation in the manner and for the purposes stated constitute "carrying on or doing business" within the meaning of the statute. The plaintiff railroad companies based their claim of exemption from the tax and their right to recover in these actions upon a line of cases culminating in the case of N. Y. C. & H. R. R. Co. v. Gill, 219 Fed. 184, 134 C. C. A. 558, decided by the Circuit Court of Appeals for the First Circuit on January 13, 1915. A somewhat detailed consideration of the cases is essential to a determination of the question presented.

In construing the statute under consideration, the Supreme Court has held that the special excise tax is imposed, not upon the property of a corporation, nor upon the franchises of a corporation irrespective of their uses, nor upon the income of a corporation, but upon the privilege of doing business in a corporate capacity. Corporation Tax Cases, 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Stratton's Independence v. Howbert, 231 U. S. 399, 34 Sup. Ct.

136, 58 L. Ed. 285; United States v. Whitridge, 231 U. S. 144, 34 Sup. Ct. 24, 58 L. Ed. 159. In defining the subject of the tax, the Supreme Court has distinguished between corporate acts which are confined to the maintenance of the corporate existence and the passive management of purely internal affairs of a corporation, and those which extend to the functions and the purposes for which a corporation is organized.

One of the earliest cases which required of the Supreme Court an expression of opinion as to whether corporate acts of a given character constituted "doing business" was the case of Cedar Street Co. v. Park Realty Co., embraced within the Corporation Tax Cases, 220 U. S. 107, 171, 31 Sup. Ct. 342, 357 (55 L. Ed. 389, Ann. Cas. 1912B, 1312). In that case, the Park Realty Company was organized to sell and lease real estate, to operate and manage hotels, and to make contracts in connection therewith. The Realty Company was engaged in no business except the management and leasing of one hotel. The court said:

"We think it is clear that corporations organized for the purpose of doing business and actually engaged in such activities as leasing property, collecting rents, managing office buildings, making investments of profits, * * * dividing profits, and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law."

The next case before the Supreme Court presenting the same question was Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428. In that case it appears that the syndicate was originally organized for and at one time engaged in the business of renting space in an office building owned by it and collecting and receiving rents therefor. It leased all of its real estate for a long term at a fixed rental, and then procured an amendment to its charter which declared that the sole purpose of the corporation was to hold title to the property demised, receive the rentals, and distribute them among its stockholders. The court found that the corporation, after the lease of its property and the amendment to its charter, had wholly parted with control and management of the property, and decided that in holding title to the property subject to the lease, and in receiving and distributing the rentals, it was not "engaged in business" and was not "doing business" within the meaning of the act.

Out of the law of these two cases grew the case of McCoach v. Mine Hill & Schuylkill Haven Railroad Co., first heard in the Circuit Court for the Eastern District of Pennsylvania (192 Fed. 670), affirmed by this court, and finally decided by the Supreme Court (228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842), in which the question was whether, under the facts of that case, the Mine Hill Company was "doing business" in the sense in which the Park Realty Company was doing business, or had gone out of business in the sense that the Minneapolis Syndicate had done. The Mine Hill Company was incorporated by an act of the Legislature of the state of Pennsylvania of 1828 (P. L. 205) for the purpose of constructing and operating a railroad, with appropriate powers, including the power of eminent domain. Under its charter a railroad was built and for many years operated. Upon au-

thority of the same statutes of the state of Pennsylvania under which the railroad properties of the plaintiff railroad companies were leased, the Mine Hill Company in 1896 leased its entire railroad, rolling stock, and all other property to the Philadelphia & Reading Railroad Company for a term of 999 years at a yearly rental. The Mine Hill Company agreed to maintain its corporate existence and organization and to exercise for the benefit of the lessee company every right and privilege retained, among which was the power of eminent domain.

The corporate activities of the Mine Hill Company included the holding of stockholders' meetings, the election of officers, the maintenance of offices and clerical force at substantial cost, the collection of rentals, revenue, dividends, and interest on deposits, the investment of funds, and the payment of taxes, as well as the maintenance of its corporate existence. While retaining the power of eminent domain, to be exercised when requested by the lessee, the District Court upon the first consideration of the case, and the Supreme Court upon its final review, expressly called attention to the fact that during the taxing years in question the lessor company had not exercised that power; the latter court leaving for future adjudication the question now under consideration by expressly declaring that:

"We therefore do not pass upon the question whether, if it should do so, it would be taxable under the act in question."

The Supreme Court distinguished the Mine Hill Case from the Park Realty Co. Case, and, following the Minneapolis Syndicate Case, found that the Mine Hill Company during the period in question "was not engaged at all in the business of maintaining or operating a railroad, which was the prime object of its incorporation," and that the effect of the—

"legislation and the lease made thereunder was to constitute the Reading Company the public agent for the operation of the road, and to prevent the Mine Hill Company from carrying on business in respect to the maintenance and operation of the railroad so long as the lease shall continue. And it is the Reading Company, and not the Mine Hill Company, that is 'doing business' as a railroad company upon the lines covered by the lease, and is taxable because of it. The Corporation Tax Law does not contemplate double taxation in respect to the same business."

The case of Anderson v. Morris & Essex Railroad Co., 216 Fed. 83, 132 C. C. A. 327, heard and decided by the United States Circuit Court of Appeals for the Second Circuit, has an important bearing upon the question at issue, for the reason that the particular act relied upon in that case as constituting "doing business" did not relate to the maintenance of the existence nor to the purely internal affairs of the lessor corporation, but extended rather to one of the public purposes for which the corporation was organized, at least to the extent of providing payment for the construction and purchase of the instrumentalities by which the business of the railroad was to be done. The terms of the lease by which the entire property of the Morris & Essex Railroad Company was demised to the Delaware, Lackawanna & Western Railroad Company are so similar to the terms of the leases in the cases under consideration that they need not be recited, except to note an

additional provision by which the Morris & Essex Railroad Company, the lessor, was required, upon the request of the lessee company, to execute and deliver its bonds in such amounts as might be required by the lessee company for the completion of a certain part of its railroad then under construction and for the purchase of equipment. In pursuance of this provision of the lease, and in obedience to a request made thereunder, the lessor company pledged its property by issuing, and delivering to the lessee company, $1,400,000 of its bonds for the payment of the work done and equipment purchased by the lessee company. The execution and delivery of the bonds constituted the act, and the only act, under the decision of the court, upon which was based the claim that the lessor company was "doing business," and was therefore liable to assessment under the Corporation Excise Tax Act. In deciding whether the corporate act of the lessor company constituted "doing business," within the meaning of the statute, the court said:

"The lessor company, however, had retained the power to issue bonds and to execute deeds of the leased property, but such powers it could exercise only with the consent and at the request of the lessee company, which latter company guaranteed the payment of both the principal and interest, and alone derived any advantage from their issuance, as the income of the lessor's stockholders was definitely fixed by the lease for all time. The act done was a purely formal act done by the lessor to enable the lessee to raise money on the security of the property for its development and operation in the conduct of the railroad business. In doing it the lessor was not 'carrying on or doing business,' within the meaning of the Corporation Tax Act. The words 'carrying on or doing business' and 'engaged in business' must be given their ordinary and natural signification, and, given that signification, the act done is not within the meaning of the statute. The lessor company was not an actively operating concern. Under the terms of this lease the lessor corporation had practically gone out of business and was disqualified from any activity respecting the operation and management of the railroad business which it had been incorporated to carry on. The issuance of the bonds was an act done simply to enable the lessee to enjoy, use, and exercise the property, franchises, and rights which the lessor had previously demised, and did not amount to a resumption of business which the lease had transferred, or a 'doing of business' in the statutory sense."

In the case of N. Y. C. & H. R. R. Co. v. Gill, 219 Fed. 184, 134 C. C. A. 558, which is the last decided case upon the subject, the United States Circuit Court of Appeals for the First Circuit cited with approval and expressly followed the reasoning of the opinion of the United States Circuit Court of Appeals for the Second Circuit in Anderson v. Morris & Essex Railroad Co., supra. In the Gill Case the excise tax was assessed against the Boston & Albany Railroad Company, which had leased its property to the New York Central & Hudson River Railroad Company upon terms, we may assume, similar to the terms of the leases in the several cases considered. In this case the lessor company, besides issuing bonds as in the case of the Morris & Essex Railroad Company, "had on certain occasions taken steps in exercise of its right of eminent domain." How far these "steps" extended, and how far, therefore, they might distinguish that case from the cases at bar, does not appear. The steps so taken, however, were at the lessee's instance and request, in order to obtain additional land necessary for the proper operation of the leased railroad, at the lessee's sole expense and under its direction, and in accordance

with the provisions in the lease. The bonds were issued to pay for the land "thus acquired." The court held that there was no reason for regarding the "land takings" as "doing business" in the statutory sense, if, as held in the case of the Morris & Essex Railroad Company, the issuance of bonds is not to be so regarded, accepting the interpretation there given:

"Construing the words in this statute, 'doing business,' or 'engaged in business,' as having direct reference to the active business for which a railroad corporation is incorporated, as correct, [and] that these words had such relation in this statute that they must be given 'an ordinary and natural significa- tion,' and in effect that the corporation must be *an actively operating concern.*"

It thus appears that in the First, Second, and Third judicial circuits cases have been presented calling for construction of the statute with reference to corporate acts which were not purely primary or internal as defined in the previous cases, and therefore present new questions for decision. In the case in the Second circuit the corporate act in- volved was the issuance of bonds by the lessor company, pledging its property as security for the payment of debts incurred by the lessee company in the extension, construction, and equipment of the leased road. In the case in the First circuit the lessor company acquired property to meet the requirements of the lessee company in the opera- tion of the leased property and issued bonds to pay for the same. The cases in the Third circuit, being the two here under consideration, are distinguished from those in the other two circuits, in that the leased property was not pledged, nor were bonds issued by the lessor com- panies; the corporate acts, and the only corporate acts charged as "do- ing business," being the acquisition of property by the lessor companies, by purchase and condemnation, upon the request and at the expense of the lessee company, and for the use and benefit of the lessee com- pany in operating the leased roads under the leases.

As income in a certain sense was derived from the operation of the leased railroads, we will briefly consider the sense in which the act em- ploys the word "income," before proceeding to a discussion of the character of the corporate business intended by the act to be taxed. The statute classifies the corporations intended to be taxed by prescrib- ing the essentials that bring them within its operation as follows:

First, "every corporation * * * organized for profit;" second, "having a capital stock represented by shares;" third, "organized under the laws of any state;" and, fourth, "engaged in business, * * * shall be subject to pay annually a special excise tax;" fifth, "with respect to the carrying on and doing business of such corporation."

The plaintiff corporations were organized for profit under the laws of a state, and their capital was represented by shares, and in these particulars and to this extent at least they were within the statute. Be- ing organized for profit, the statute contemplates profits to be earned and income derived from "carrying on or doing business," not for the purpose of taxing either profits or income, but, first, to determine whether the corporation is within the class intended to be taxed, and, second, in order to have a means by which the tax may be calculated. The statute provides that the tax imposed shall be "equivalent to 1 per cent. upon the entire *net* income" over a certain amount. "Net in-

come" imports a "gross income," and the difference between the two implies the expenditure of income for some corporate purpose, as that of "carrying on or doing [the] business" for which the corporation is organized.

. Now, while we make no point of the fact that in this case dividends on stock and interest on bonds were paid by the lessee company directly to the stockholders and bondholders of the plaintiff corporations, and not to the corporations themselves, nevertheless the income so received was not derived from railroads operated by them, but was the consideration paid for the right to exclusively possess, manage, and operate the leased railroads by the lessee company. The plaintiff railroad corporations received no income from railroads operated by themselves, and expended none in the operation of railroads or for any other purpose. Receiving no income and disbursing none, there was, of course, no gross income from which to determine net income, and no means to measure an excise tax as provided by the statute. Therefore, in being without income from operating their railroads, the lessor railroad corporations to this extent at least were outside of the scope of the statute, unless indeed it be decided that, because of their several disconnected acts of acquiring real estate, they were engaged in business and were carrying on and doing the business for which they were organized, within the meaning of the act.

From the decisions reviewed, it may be accepted as established that corporate acts performed by a corporation in the exercise of its primary franchises, as the maintenance of its corporate existence, do not constitute "doing business" within the meaning of the statute, nor do corporate acts which relate strictly to the internal affairs of the corporation and which do not include the exercise of its secondary franchises. The statute, therefore, distinguishes between corporate acts and discloses an intention to impose a tax for the privilege of doing only those acts which constitute "carrying on and doing business."

It is contended, however, that the transactions by which properties were purchased and condemned by the plaintiff corporations were something more than corporate acts—that they were in their nature business transactions, and being such, of necessity, constituted "doing business" within the meaning of the statute. But it is clear that the statute, as interpreted, distinguishes between business transactions, as well as between corporate acts, and the application of the statute to a given transaction or act, whether partly business or entirely corporate in its nature, must after all be determined by its character and purpose. By purchasing and condemning property the plaintiff corporations performed acts which were both corporate and business in their nature. The purpose of the acts is disclosed by what was accomplished by them. By the acts done the corporations merely acquired the instrumentalities to do the thing and to carry on the business for which they were incorporated. There is a distinction between acquiring the instrumentalities to do business and the doing of business with the instrumentalities acquired.

The primary purpose for which the plaintiff railroad companies were incorporated was the transportation of persons and property. When

they became incorporated, they proceeded under appropriate powers to acquire property, upon which and over which they built their lines of railroad. In acquiring property and in constructing railroads they doubtless engaged in business transactions under authority of their corporate powers, but not until they had acquired property and constructed their railroads can they be said to have engaged in and carried on the business for which they were primarily organized. Having acquired and constructed their lines of railroad, the plaintiff corporations proceeded to operate them, and after a time they disposed of them by lease, conveying in each instance all real and personal property within their ownership, and all rights in connection therewith, which, under the law they could convey. By disposing of their properties under the terms of the leases, the lessor railroad corporations parted with all control over and management of the same, and the right to possess, operate, and manage the roads became vested and exclusively vested in the lessee. Upon the transmutation of property there was a contemporaneous transfer of business activities. What the owners of the railroads had done before, the lessee of the railroads do now. The profits, which before went to the owners, now go to the lessee. All rights to direct the policy or participate in the operation and management of the roads have been transferred to and are now vested in the lessee, but in transferring their properties and their rights the lessor companies could not transfer the right of eminent domain which had been delegated to them. They therefore contracted, for the consideration given, to exercise the power of eminent domain, so reserved and retained, for the benefit of the lessee and for the lessee's use and enjoyment of the property leased, when requested so to do.

When the lessor railroad companies were requested to exercise for the lessee their power of eminent domain, and in response did the acts which it is claimed amounted to "doing business," their acts were purely formal, constituting the dry exercise of power, in which no profit inured to them, their rentals being established, and in which all advantage inured to the lessee, which was the one corporation then actually doing business in the sense of operating the roads to which the several companies bore different relations, and which, therefore, was the one corporation liable to be taxed for the privilege of doing that business.

[2] The manner in which the expressions "engaged in," "carrying on," or "doing" business are joined in the statute does not denote that the expressions are used in opposition to one another, or that separately they express different meanings. They are used in the conjunctive sense, and are employed to indicate the one character of corporate business intended by the statute to be taxed. Therefore the expression "engaged in business" means the same thing as "carrying on business," and the latter expression has the same meaning as "doing business." The three expressions, either separately or connectedly, convey the idea of progression, continuity, or sustained activity. "Engaged in business" means occupied in business; employed in business. "Carrying on business" does not mean the performance of a single disconnected business act. It means conducting, prosecuting, and continuing business by performing progressively all the acts normally in-

cident thereto, and likewise the expression "doing business," when employed as descriptive of an occupation, conveys the idea of business being done, not from time to time, but all the time. Such was the character of the business being done by the lessee company, but such was not the character of the business being done by the lessor corporations, when the excise taxes were assessed.

It is not claimed that the plaintiff corporations, the lessors, were operating the leased roads when the taxes were assessed, and it is not denied that they had gone out of the business of transportaion, and no longer received profits from the railroads otherwise than determined by the leases, nor is it denied that by the leases the plaintiff railroad companies had so placed themselves that they could not have engaged in the business of transportation over the leased lines, even had they wanted to. In other words, the plaintiff railroad companies, the lessors had disqualified themselves to carry on or do the business either of operating, managing, or conducting transportation over the leased lines. What they did with the power they had left, namely, purchased and condemned property at another's request, with another's money, for another's use, and for another's profit, was not, in our opinion, a resumption by the lessor companies of the control, operation, or business of the leased properties, and the particular acts done under the limitation of their reserved powers did not amount to "doing business" within the meaning of that expression as intended by the statute.

The judgments below are affirmed.

McPHERSON, Circuit Judge, took no part in the consideration and decision of these cases.