### PHILADELPHIA TRACTION CO. v. McCOACH, Collector of Internal Revenue.

#### (District Court, E. D. Pennsylvania. August 2, 1915.)

#### No. 2020.

1. INTERNAL REVENUE ⚙═9—SPECIAL TAX ON BUSINESS—STATUTES—CONSTRUCTION.

   Act Aug. 5, 1909, c. 6, 36 Stat. 112 (Comp. St. 1913, §§ 6300–6307), imposing a tax on corporations doing business, must be construed as imposing an excise tax, and not a franchise, property, or other direct tax.

   [Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ⚙═9.]

2. INTERNAL REVENUE ⚙═9—SPECIAL EXCISE TAX ON CORPORATIONS—"DOING BUSINESS."

   A street railway company, which surrenders to another company the management and control of its physical possessions, and which transfers to the latter company its rights and franchises to operate its railway, reserving only its corporate existence and the right to receive and disburse its income, and which subsequently does nothing more than is necessary to its existence as a corporation and the distribution of its annual income,

such as the retiring of bonds under a sinking fund provision of a mortgage under which they were issued, joining as a party to extension agreements for the payment of bond issues of underlying railway companies, or some of them, and the receipt of sums as compensation for the transfer of its rights, for organization expenses, and for money which it paid out to and for the underlying companies, is not "doing business," within Act Aug. 5, 1909, imposing a special excise tax on corporations doing business.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

At Law. Action by the Philadelphia Traction Company against William McCoach, Collector of Internal Revenue. Judgment for plaintiff.

Boyd Lee Spahr and Ellis Ames Ballard, both of Philadelphia, Pa., for plaintiff.

Edward S. Kremp, Asst. U. S. Atty., of Reading, Pa., and Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This case was tried before the court, instead of before the court and a jury, by agreement of the parties, under the provisions of the acts of Congress dispensing with jury trials.

The basic facts are not in dispute. So far as there is a question of fact involved, it is a question of the ultimate fact to be found by inference from certain, in this respect, minor facts which are not in controversy. In a very substantial sense, however, the case comes before us with the effect of a case stated to have the law of the case determined. The proper conclusion to be reached involves commingled findings of fact and conclusions of law. There is both the fact of doing business and the meaning of the act of Congress to be found. We have met whatever technical formal difficulties this may present by stating our conclusions both in the form of findings of fact and of conclusions of law.

The skeleton facts are these: The United States authorities levied upon each of plaintiffs an excise tax by color of the authority of the act of Congress of 1909. The plaintiffs each paid the tax under protest and demanded its return. The defendant refused to refund on the ground that the tax had been lawfully collected. The plaintiffs deny liability for the tax. All the formal requirements of the law have been complied with, and the sole question is the one indicated.

The beginnings of the controversy lie in that effort which is everywhere being made to transmute a mental apperception, a mere concept of the mind, into something sufficiently concrete to be offered for sale as a thing having commercial value. A number of different street railway companies are organized; they receive the grant of franchises and engage in the business for which they were incorporated. They are separate entities, each independently "doing business." Some one sees that there would be an economy in operation if all these different

companies could be brought under one management, and probably an increase of revenue would result as well. He thereupon conceives the idea of organizing another company, to take over the control of what then becomes a number of underlying companies, so as to subject them all to one management. When this is done there will have been an increase in the combined net income. The expectation of this net income is then capitalized through the form of an issue of stock by the operating company, and at once you have a concrete thing which may be sold. This is "making money" in a very practical sense. From the viewpoint of the exciseman this works a hardship, which in his eyes is an injustice, because the consequence may be that what would otherwise be net income and measure the tax levy becomes an expense item which causes net income to vanish. The combination, which is the foundation of the scheme, may be effective through operating agreements, leases, ownership of stock, or other means of control of the subsidiary company, or may be accomplished by a commingling of these methods.

[1] Such a scheme was adopted here and raises the question propounded in this case. This arises out of the circumstance that Congress has imposed an excise tax on corporations "doing business," and at once the inquiry arises: Are these companies "doing business" within the meaning of the act of Congress? If they are, they are admittedly liable to the payment of the tax imposed. The converse must likewise be admitted. The act must be interpreted in the light of the constitutional limitations imposed upon Congress. The constitutionality of the act has been determined and is, of course, not open to question. This has been upheld, however, by the finding that the tax imposed is an excise tax, and not a franchise, property, or other direct tax. This requires us to construe the act as imposing an excise tax. To sustain the tax power as an excise, and then levy under it a direct tax, would be approaching too closely the line of intellectual dishonesty.

[2] In this case there are five underlying companies. The principles of law, which apply, apply to all the cases. They were therefore heard together, and by stipulation the same testimony and evidence is to be taken as given and introduced in each case. They differ only in the respects which will be noted. The discussion of one case will therefore suffice for all, although each case will in form be separately disposed of.

In its legal aspects the street railway system of Philadelphia is so complex that a mere statement of the different parts of the entire structure would give undue length to this opinion. We will confine ourselves to a statement of the special features upon which the decision of the question before us turns.

The history of the origin and evolution of the rights of the corporate owners of these street railway systems begins with the grant of franchises to lay tracks upon the public streets, own a railway system, and operate it. The motive power permitted to be employed has been from time to time extended to include cables and other means for the propulsion of cars, the latest development being electrical power applied by a trolley or other means. Coincidentally with the expansion of

what may be called the physical powers of these railways there was a like enlargement of other powers. The original conception of such companies was that they would own railways and operate them. There was then authorized the incorporation of so-called traction companies, the essential conception of which was that they were to furnish the power and the organization to operate the lines owned by other companies. There was a like expansion of the powers given to these various companies, through which they could accomplish the purpose of their incorporation, such as the power to issue bonds, to purchase the stock of other companies, to lease the property and franchises of other companies, and the like. Some of them might be mere holding companies. In the end the broad question with which we are concerned resolves itself into this: Does a street railway company cease to do business when it surrenders to another company the management and control of its physical possessions and transfers to the second company its right and franchise to operate its railway, reserving only its corporate existence and the right to receive and disburse its income.

An analogue may be found in the situation of an individual, who gives up active participation in the business in which he was formerly engaged, but retains in some form or other a share in the money results. It is obvious that the answer to this question involves a finding of fact, and it soon becomes apparent that the line drawn through the point at which a person has ceased to do business is a line which is sometimes difficult to draw. A little further reflection discloses that the answer to the question will depend largely upon the form which the change takes. Take the simple case of a street railway, which owns and operates its railway, receiving fares, and out of its gross receipts are paid its operating expenses, and out of the net income thus determined, or a portion of it are paid dividends to its stockholders. It would be clear to every mind that as long as it was operating its own road, collecting fares and paying the operating expenses incurred, it was engaged in the street railway business. The receipt and division of income among its stockholders of itself would, to some minds, be part of the business it was doing. To other minds, this would be a distinct and separate thing, not the carrying on of the business, but the sharing of the profits from the business.

The distinction may be brought out by calling to mind the somewhat analogous distinction between the purposes for which a corporation is formed, or the business it is to conduct, and the incidental powers conferred upon it as necessary or helpful to the carrying out of its corporate purposes. The purpose of its incorporation, in the sense of its business purpose, may be to transport passengers from one point to another. It may be given the right restricted or unrestricted, or be granted the power to charge for this service by established rates of fare. It might have the power to borrow money and to secure its repayment by an issue of bonds to an amount legally limited or unlimited. It might be given authority to build railroads anywhere, or be limited to railways upon city streets, or only on designated streets. The power might be extended to acquire by lease or to lease its own.

It might possess or have withheld from it the power of eminent domain. Its business purposes and its powers might be few or many, but the distinction between powers and purposes would still be clear. This is true, notwithstanding that the two things overlap in the sense that among the rights given and the powers conferred is that to engage in the designated business.

The same line of difference runs through the exercise of these powers or the carrying out of these business purposes. A corporation or individual might be doing business, no matter how small the volume; but a corporation which borrowed money and issued bonds, which it had the power to do, could not be truly said to be engaged in that business, unless that was the purpose of its incorporation. The mere fact of the receipt of moneys from the income of a business is not the test. It would be forcing the meaning of the phrase to say that one was engaged in railroad business simply because his income was derived wholly from railroad investments. The distinction adverted to has been recognized and made clear in the adjudged cases, of which McCoach v. Minehill & Schuylkill Haven Co., 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842, is one. The answer to the question of doing business is to be found in the facts of each case.

As has already been stated, the Philadelphia Traction Company was incorporated under the Traction Company Act. This was the act of June 13, 1883 (P. L. 122). The act was in form supplemental to existing legislation. It conferred upon corporations incorporated under it authority to enter into contracts with railway companies owing lines to construct and operate motor appliances for the traction of the cars of the railway company. It may be observed in passing that the act conferred no power to acquire property of railway companies by lease, and because of this omission, and of a consequent doubt of its corporate power, no leases of railway properties were made, but operating contracts were entered into by each under date of April 30, 1884. The Traction Company agreed with the West Philadelphia Passenger Railway Company to construct the necessary traction apparatus and to act as operator of the cars of the railway company, and a like agreement was entered into on June 30, 1884, with the Union Passenger Railway Company.

Following this, on November 28, 1888, the Traction Company surrendered the charter above granted it and took out letters patent under the act approved March 22, 1887 (P. L. 8). This act conferred power to construct and operate motor appliances and to enter into agreements with railway companies for the traction of their cars. Plaintiff, as a corporation incorporated under the latter act, could enter into leases, and did establish relations with the Thirteenth & Fifteenth Street Passenger Railway Company on January 15, 1892. The agreement was called an "agreement of lease," but its intendment was that the Traction Company should take over the street railway lines of the lessor for the purpose of operating. The Continental Passenger Railway Company of Philadelphia was a street railway company incorporated for like purposes as that of the other railway companies. The control and operation of its properties likewise passed to the Philadelphia

Traction Company through the medium of first passing into the control of the Union Passenger Railway Company by means of a lease, and thus becoming included among the possessions of the Union Passenger Railway Company which passed to the Philadelphia Traction. The position of the Philadelphia Traction Company thus acquired was passed over to the Union Traction Company, and by it in turn to the Philadelphia Rapid Transit Company. These transfers are designated as leases, and the conveying clause is expressed as "let and demise." The legal intendment, however, and effect, is an assignment of all rights held by the Philadelphia Traction Company, including the agreements and leases, etc., above referred to.

Subsequently to the passing of the possession and control of what each of these companies had previously possessed, each of the companies did certain things which are referred to in connection with the disposition of each case, based upon which the United States asks for a finding that they are still doing business within the meaning of the act of Congress of 1909. The position of counsel for the United States is that as each of these railway companies was incorporated for the purpose of operating its line of road, and for a time did operate it, when it entered into the agreement with the Traction Company to operate for it, it was still operating its railway by its operating agent, the Traction Company, and was therefore still doing business. The Traction Company was likewise doing business, because it was incorporated for the purpose of operating railway systems for other companies, and was therefore doing the very business for the purpose of doing which it had been incorporated, and that it did not cease to be doing the same business when it secured the services of the Union Traction Company to perform the required service for it, nor when the same obligation was passed on to the Rapid Transit Company. Moreover, each of these companies never ceased entirely to do business, because from time to time they did things in furtherance of their corporate purposes.

With respect to the first proposition, this is nothing more than a statement of the "facit per alium facit per se" maxim. It is, of course, true in a sense that when a man enters into a contract with a builder to erect a house for him (the owner) that the owner may be said to be building a house; but if the real builder has such relations with the owner that the term "independent contractor" applies to him, such contractor is engaged in the building business, but it would be an abuse of the common use of language to say that the owner was so engaged.

The special things which the Traction Company did subsequently to the cessation of its activities as a traction company may be summarized as the retiring of bonds under the sinking fund provision of the mortgage under which they were issued, joining as a party to extension agreements for the payment of bond issues of the underlying railway companies, or some of them, and the receipt of large sums of money as compensation for the assignment of its rights, for organization expenses, and for moneys which it paid out to and for the underlying companies.

With respect to these acts, they are nothing more than acts necessary to the existence of the corporation, and the distribution of its

annual income. They do not necessarily indicate, nor indeed throw any light upon, the question of whether or not the company was doing business, and do not justify such a finding.

The views of the court and the conclusions reached are voiced in the following finding of facts and conclusions of law:

## Finding of Fact.

1. So far as it is a question of fact, the Philadelphia Traction Company was not carrying on or doing business in the year 1909, within the meaning of the act of Congress of August 5, 1909.

## Conclusions of Law.

1. So far as it is a question of law, the Philadelphia Traction Company was not engaged in or doing business in the year 1909, within the meaning of the act of Congress of August 5, 1909.

2. The Philadelphia Traction Company was not subject to the excise tax imposed by the said act of Congress for the year 1909.

3. The plaintiff company is entitled to judgment for the amount of its claim, with interest.

4. The plaintiff company is entitled to costs.

The plaintiff may move for formal judgment in its favor and against the defendant in accordance with the foregoing opinion.

The requests of the defendant for findings of conclusions of law, as prayed for, are denied