## INTERNATIONAL SALT CO. v. PHILLIPS, Collector of Internal Revenue.

(District Court, M. D. Pennsylvania. January 20, 1925.)

No. 1501.

1. **Internal revenue ⟷9—Corporation held liable for excise tax on its capital stock; "carrying on or doing business."**

A corporation authorized by its charter to manufacture, mine, and deal in salt and products into which it enters, and to acquire, own, and sell stock and securities of other corporations, and which in practice has at all times been actively engaged in business, chiefly the controlling through stock ownership of other corporations engaged in the salt industry, buying and selling their stock and bonds, collecting dividends, which it disbursed to its own stockholders, and issuing and retiring its own stock and bonds, *held* not a mere holding company, but subject to excise tax on its capital stock, imposed by Revenue Act of 1918, § 1000, subd. (a) (1), being Comp. St. Ann. Supp. 1919, § 5980n, on corporations "carrying on or doing business."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Carry on Business.]

2. Internal revenue ⬥28—Refund of taxes for one year not a bar to their collection for another year.

Settlement of a suit for recovery of taxes paid for certain years is not a bar to the collection of the tax for subsequent years.

At Law. Action by the International Salt Company against David W. Phillups, Collector of Internal Revenue. Judgment for defendant.

James H. Torrey, of Scranton, Pa., and Henry B. Twombly, of New York City, for plaintiff.

Andrew B. Dunsmore, U. S. Atty., of Wellsboro, Pa., and Nelson T. Hartson, Sol. of Internal Revenue, and Clarence O. Webb, Asst. Atty. Internal Revenue, both of Washington, D. C., for defendant.

WITMER, District Judge. The International Salt Company, a New Jersey corporation, plaintiff, has instituted this action against the defendant, David W. Phillups, collector of internal revenue, for the recovery of the capital stock tax of $5,866.30 for the year ending June 30, 1919, of the capital stock tax of $6,330.50 for the year ending June 30, 1920, of the capital stock tax of $7,023.50 for the year ending June 30, 1921, and of the capital stock tax of $7,150 for the year ending June 30, 1922, making a total of $26,370.30, all of which were paid under protest.

The ground of each protest was that the International Salt Company is strictly a holding company, whose object and activities are exclusively restricted to holding the stocks and securities of the International Salt Company of New York and the Retsof Mining Company, and other companies, and that it was not doing business under title X of the Revenue Act of 1918 and its various amendments and the existing regulations of the Treasury Department.

The defendant denies the plaintiff's averments, and alleges affirmatively that the plaintiff was engaged in carrying on or doing business within the meaning of the named act and its regulations, under the facts as set forth in an agreed "stipulation of facts" submitted to the court. The case is being tried without jury by agreement of the parties.

[1] The issue raised presents the question whether, under the undisputed facts, plaintiff was engaged in carrying on or doing business within the meaning of the following section of the Revenue Act of 1918 (Comp. St. Ann. Supp. 1919, § 5980n):

"Sec. 1000(a) That on and after July 1, 1918, in lieu of the tax imposed by the first subdivision of section 407 of the Revenue Act of 1916—

"(1) Every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fair average value of its capital stock for the preceding year ending June 30 as is in excess of $5,000. In estimating the value of capital stock the surplus and undivided profits shall be included. * * *

"(2) (c) The taxes imposed by this section shall not apply in any year to any corporation which was not engaged in business (or in the case of a foreign corporation not engaged in business in the United States) during the preceding year ending June 30, nor to any corporation enumerated in section 231."

The tax imposed is admittedly an excise tax, payable in advance for the year in which the company is to do business, and is measured by the fair value of the capital stock for the year preceding the taxable year. While Corporation Excise Tax Act of Aug. 5, 1909, c. 6, § 38 (36 Stat. 112), imposed "a special excise tax with respect to the carrying on or doing business" by "corporations organized for profit," and the tax imposed was measured by the net income received "from all sources," though measured by a different standard and not limited to corporations organized for profit, it taxed the same corporate business activities as the act of 1918, and therefore the interpretation by the Supreme Court of the early act is in point. In defining the nature of the 1909 act, Mr. Justice Day, in delivering the opinion of the court in Flint v. Stone Tracey Co., 220 U. S. 107, 145, 146, 31 S. Ct. 342, 347, 55 L. Ed. 389 (Ann. Cas. 1912B, 1312), said:

"It is therefore apparent, giving all the words of the statute effect, that the tax is imposed, not upon the franchises of the corporation irrespective of their use in business, nor upon the property of the corporation, but upon the doing of corporate or insurance business and with respect to the carrying on thereof; * * * that is, when imposed in this manner it is a tax upon the doing of business with the advantages which inhere in the peculiarities of corporate or joint-stock organizations of the character described."

And, continuing (on pages 161, 162 [31 S. Ct. 583]), he states that:

"The thing taxed is not the mere dealing in merchandise, in which the actual

transactions may be the same, * * * but the tax is laid upon the privileges which exist in conducting business with the advantages which inhere in the corporate capacity of those taxed, and which are not enjoyed by private firms or individuals. These advantages are obvious, and have led to the formation of such companies in nearly all branches of trade. The continuity of the business, without interruption by death or dissolution, the transfer of property interests by the disposition of shares of stock, the advantages of business controlled and managed by corporate directors, the general absence of individual liability, these and other things inhere in the advantages of business thus conducted, which do not exist when the same business is conducted by private individuals or partnerships. It is this distinctive privilege which is the subject of taxation, not the mere buying or selling or handling of goods, which may be the same, whether done by corporations or individuals."

What was the character of the plaintiff corporation, its purposes and general activities? Its chartered rights and privileges were many and numerous, while its object, as stated in the articles of incorporation, are to manufacture, mine, and trade in salt, and each and every product of salt and all articles or products of which salt forms a component part, or may be in any way utilized into a condition, combination, connection, article, substance, or form whatsoever; to purchase, sell, and deal in the same, to conduct business and to have offices in other states than New Jersey, and among other things it is expressly authorized "to hold, purchase, or otherwise acquire, sell, transfer, mortgage, pledge, or otherwise dispose of the capital stock, bonds, or other evidences of indebtedness created by any other corporation or corporations, and while holder of such stock to exercise all the rights and privileges of ownership; to guarantee the payment of dividends or interest on any shares, stock, debentures, bonds, or other securities issued by or any other contract or application of any corporation; to make and enter into contracts of every sort and kind; to issue its own bonds, debentures, and evidences of indebtedness of all kinds without limit as to amounts, and to secure the same by mortgage, pledges, or otherwise; and to assume or guarantee the principal or any part thereof of any mortgage made by any company whose business the plaintiff shall acquire or become connected with, and to do all and everything necessary, suitable, or proper for the accomplishment of any of the purposes or attainment of any one or more of the objects enumerated.

Judging from the tenor of its character and its activities since its incorporation, the plaintiff was incorporated to control, by and through stock ownerships, the business and affairs of numerous corporations engaged in the salt industry, and that since its incorporation it has been in business in conformity therewith. Its stated capital in 1901, when incorporated, was $125,000, which was, several months thereafter, increased to $30,000,000, and finally, on April 21, 1913, reduced to $7,077,130. During the years 1901 to 1908, inclusive, the company issued its capital stock in the total amount of $18,231,390. Of this amount $12,154,260 was retired and canceled on or about March 30, 1913, leaving outstanding $6,077,130, which has since remained out. During the year 1901 the company was authorized to issue $12,000,000 in bonds, and executed a mortgage or deed of trust, with the United States Mortgage & Trust Company as trustee, and since then it has been engaged in issuing and retiring such bonds. In 1901 the company purchased 23,679 shares (out of a total issue of 36,000 shares) of the stock of the Retsof Mining Company in exchange for a like amount of its own stock. About the same time it also acquired 29,709 shares of preferred stock and 43,512 shares of common stock of the National Salt Company, exchanging therefor its own stock in the amount of $4,648,290 and its bonds in amount of $2,970,900. In 1902 the company acquired $1,000,000 of the capital stock of the International Salt Company of Illinois (total issue $1,000,000), exchanging therefor $1,330,000 of its own bonds. In 1903 the company acquired the total outstanding capital stock of the Port Huron Salt Company and the Port Huron & Southern Railroad Company, paying therefor with its own bonds. During the year 1904 the company acquired, for $450,000 cash, shares of the capital stock of certain other salt companies, which stocks, together with the stock of the Illinois and the Port Huron Salt Companies, and the railroad company, were sold by the company during the year 1910. During the year 1905 the company acquired the entire capital stock of the International Salt Company of New York, paying therefor with its own bonds. From 1905 to 1908 the company acquired 12,321 additional shares, being the remainder, of the capital stock of

the Retsof Company. During the year 1920 the company acquired, as a dividend from the Retsof Company, the total capital stock of the Avery Rock Salt Company. In 1921 the company also received from the New York Company dividend paid in the capital stock of the Detroit Rock Salt Company and the Eastern Salt Company. It now owns and holds the entire capital stock of the Avery Company and the Eastern Company. It also owns all such stock of the Retsof Company, the New York Company, and $1,328,343.75 out of a total of $1,500,000 of the Detroit Company.

During the fiscal year 1917–18 the company purchased 287 Retsof bonds (par value $1,000 each) for $200,750. During the fiscal year 1918–19 it purchased 10 Retsof bonds for $6,997.50. From March 1, 1919 to December 31, 1919, it purchased 10 Retsof bonds for $6,500 cash and exchanged five of its own bonds for like numbers of Retsof bonds. During the calendar year 1920 it purchased at various times a total of 116 Retsof bonds, paying therefor $82,951.87; and exchanged 160 of its own bonds together with $15,100 cash for like number of Retsof bonds. During the same period it also issued and exchanged 9 of its bonds, together with 6 of its bonds, purchased for $4,372.50, for 15 Retsof bonds, exchanging also during this period 4 of its own bonds for 4 Retsof bonds.

The mortgage of the company providing for a sinking fund to redeem its bonds, the company has from time to time purchased at the market price its own bonds, and has sold them at the same price to the mortgage company, trustee, in order to meet the requirements of the sinking fund. It has, through the purchase and sale of such bonds, by acquiring them for less than originally sold, derived a financial benefit to an amount somewhat less than $147,883.89.

During the taxable period, the plaintiff company, at various times indorsed the New York Company on notes to borrow money to meet its obligations. During the same time, the plaintiff receiving temporary advances of money from the New York Company to provide for its mining expenses, payment of taxes, and the purchase of Retsof bonds and of its own for the sinking fund, it also, during this time, borrowed from the Irving Trust Company $161,605.15 on collateral of Retsof bonds, for the purchase of 244 Retsof bonds.

The company pays office salaries, received dividends from its subsidiaries, and makes distribution thereof to its stockholders. It derives its income solely from the dividends of its subsidiaries, from interest paid on its investments, from bonds of the Retsof Mining Company, and from interest on bonds of the United States held by it, and the funds so obtained are expended to meet the payment of its bond interest, its dividends, retirement of its own bonds, and certain miscellaneous expenses; surplus, if any, for acquisition of Retsof bonds.

Each of the subsidiary companies has its own board of directors, officers, and managers, which the plaintiff company elects through the directors, chosen by virtue of its stock control. During the taxable period the same persons who served as officers of the plaintiff company held the corresponding places or offices of its subsidiary companies.

This tedious rehearsal, though in a summary manner, brings conviction that the plaintiff company, which was incorporated mainly for the purpose of controlling, through stock ownership, the business and affairs of the corporations engaged in the salt industry, was during the taxable period in suit, pursuant to its incorporation, engaged through stock ownership, and the accompanying financial advantages resulting from the control of certain named subsidiary companies, in the exercise of the corporate privileges granted for its own profit and gain.

The company has been constantly engaged in the particular business contemplated by its charter, and entered upon and pursued from its inception throughout the taxable period. It did not retire from the business in which it originally engaged, pursuant to its charter, viz. the acquisition and control of corporations engaged in the salt industry. Though it did not apparently obtain the stock control of any such corporations during the stated period, it was nevertheless engaged in the continued acquisition of such stock and the payment of obligations outstanding against certain corporations, thereby completing the absolute acquisition of the same. Without referring to the particular activities of the company as a basis for this conclusion, the admitted facts indicate that, if ever it was in business under its charter, it was continuing such when the tax was assessed. It had not retired, in the sense of Anderson v. Morris & Essex R. R. Co., 216 F. 83, 132 C. C. A. 327, New York Central & H. R. R. v. Gill, 219 F. 184, 134 C. C. A. 558, Philadelphia Traction Co. v. McCoach (D. C.) 224 F. 800, Lewellyn v. Pittsburgh,

Bessemer & Lake Erie R. R. Co., 222 F. 177, 137 C. C. A. 617, Traction Companies v. Collectors of Internal Revenue, 223 F. 984, 139 C. C. A. 360, Jasper & E. R. R. Company v. Walker, 238 F. 533, 151 C. C. A. 469, and Zonne v. Minneapolis Syndicate, 200 U. S. 187, 31 S. Ct. 361, 55 L. Ed. 428, and kindred cases, in which corporations were relieved from paying their assessments because of having gone out of business; nor had it reduced its activities to the mere owning and holding of property and the distribution of its avails, and only such acts as are necessary to continue that status, as said by Judge Day, in distinguishing the corporations from one still active and maintaining its organization for the purpose of continued effort in the pursuit of profit and gain. Von Baumbach v. Sargent Land Co., 242 U. S. 503, 37 S. Ct. 201, 61 L. Ed. 460.

Much dependence is placed by the plaintiff upon the weight of United States v. Nipissing Mines, 206 F. 431, 124 C. C. A. 313, and Butterick Co. v. United States (D. C.) 240 F. 539. In the latter case the plaintiff did nothing more than receive and distribute income derived from different dividends by the subsidiary and acting companies in the publication of magazines. Plaintiffs held meetings of stockholders and directors, issued proxies to vote stock of operating companies, and also indorsed notes of the subsidiary company to promote the successful operation of the latter. In the Nipissing Case it was held that, where defendant company was organized to own the stock of a mining company, and had no assets, except such stock, a small amount in bank, and office furniture, etc., and did nothing, other than receive dividends from the operating company and distribute such among its own stockholders, it was not doing business within the act, and was not subject to the tax.

These cases might readily be distinguished, if deemed important or helpful in here reaching a conclusion; but the decision of the case in hand, as in all cases of its character, turns upon its own particular and peculiar facts and is ready of solution to the degree that the finding is or not difficult, whether in the nature of its charter and the character of its business activities, the corporation was, at the time of its assessment, actually engaged in the pursuit of profit and gain under its corporate rights and franchises. In determining this matter neither of the cases mentioned is either persuasive or helpful, the court having found that in the sense as the doing of business has been regarded by the Supreme Court, having found that the plaintiff, during the taxable period, was continuing in the acquisition of stock and in the management of the corporation for profit and gain, the primary purpose for its organization, and must be regarded as having been engaged in business and liable to the tax imposed.

[2] The further suggestion that the court is bound by a prior refund of taxes collected for the years 1916, 1917, and 1918, after suit was instituted for their recovery, is without basis. The matters involved are of a judicial nature, and while the opinion of the tax-collecting department upon a given subject might be persuasive, it would nevertheless not be controlling. However, the settlement of the instituted suit was for a cause of action different from the one now under consideration, since "a suit for taxes for one year is not a bar for taxes for another year." Keokuk & Western R. R. Co. v. Missouri, 152 U. S. 301, 14 S. Ct. 592, 38 L. Ed. 450. Nor were there any distinct questions litigated and settled in the prior suit in the terms as expressed by the court.

The court accordingly finds in favor of the defendant, and directs that judgment be entered in his favor.