6

## UNITED STATES v. ATLANTIC COAST LINE CO. (three cases).*
### Nos. 4338–4340.

Circuit Court of Appeals, Fourth Circuit.

Oct. 4, 1938.

James P. Garland, Sp. Asst. to Atty. Gen. (James W. Morris, Asst. Atty. Gen., Sewall Key and J. Louis Monarch, Sp. Assts. to Atty. Gen., and Bernard J. Flynn, U. S. Atty., and G. Randolph Aiken, Asst. U. S. Atty., both of Baltimore, Md., on the brief), for the United States.

J. Crossan Cooper, Jr., of Baltimore, Md., and Robert R. Faulkner, of Washington, D. C. (Venable, Baetjer & Howard, of Baltimore, Md., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

The appellee, The Atlantic Coast Line Company, a Connecticut corporation, having offices in Baltimore, Maryland, here referred to as the plaintiff, brought these three actions in June, 1937, against the appellant, The United States of America, here referred to as the defendant, in the District Court of the United States for the District of Maryland, at Baltimore. The three actions were heard together.

The object of the actions was to recover capital stock taxes, together with interest, alleged to have been erroneously assessed and collected from the plaintiff for the years 1933, 1934, and 1935, in the sums of $6,-846.28, $6,597.36, and $6,240.28 respectively.

A hearing was had at which an agreed statement of facts was filed and a witness heard on behalf of the plaintiff. The judge below made findings of fact and conclusions of law and in December, 1937, rendered an opinion[1] holding the plaintiff entitled to recover the amounts claimed. Orders were entered giving judgment in favor of the plaintiff in each case and the defendant brought these appeals.

The sole question to be considered on the appeals is whether the plaintiff was "carrying on or doing business", during the years in question, within the meaning of the United States Revenue Act in effect at the time.

The statutes involved are the National Industrial Recovery Act, c. 90, 48 Stat. 195, and the Revenue Act of 1934, c. 277, 48 Stat. 680. The pertinent part of the N. I. R. A. reads as follows:

"Sec. 215. (a) For each year ending June 30 there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock." 48 Stat. 207.

Section 701 of the Revenue Act of 1934, 26 U.S.C.A. § 1358, is identical with the above quoted statute except as to the year mentioned.

The plaintiff corporation was originally organized in the year 1889 for the purpose of financing the acquisition of lines of railroads in the southeastern section of the United States and their consolidation into what is now The Atlantic Coast Line Railroad. The original charter of the company was amended in 1893. By the year 1914 the

---

*Rehearing denied 99 F.2d 932.

[1] No opinion for publication.

plaintiff had ceased the activities for which it was originally organized and had reduced its stock ownership in The Atlantic Coast Line Railroad Company to approximately 26 per cent of the amount outstanding. In the year 1929 the charter of the plaintiff company was again amended largely increasing the powers of the company as to the businesses it could engage in.

During the periods in question in the years 1933, 1934, and 1935, the plaintiff kept intact its corporate organization, had an office for which it paid rent, held twelve meetings of its Board of Directors each year and annual stockholders' meetings were held to pass upon the annual report and elect directors. At the meetings of the Board of Directors changes in investments were discussed and approved. During all this period expenses and salaries were paid approximating $19,000 annually, of which amount approximately $12,000 was paid as salaries to its officers. The income received by the plaintiff from its securities was in excess of $400,000 annually for the years 1933 and 1934, and in excess of $500,000 for the year 1935. The only dividend paid during this period was one of $235,200 paid its shareholders during the fiscal year ending June 30, 1935. The plaintiff had, during the years in question, assets of a book value in excess of $33,800,000, bonded indebtedness not in excess of $5,000,000, and a surplus which exceeded $17,000,000.

The plaintiff during the fiscal year ending June 30, 1933, subscribed to United States Government Bonds of a value of $1,095,700, purchased United States Bonds of a value of $100,000, purchased 1,000 shares of Atlantic Coast Line Railroad Company stock, and purchased its own certificates of indebtedness of a value of $8,100. During this period it likewise sold 1,000 shares of Atlantic Coast Line Railroad Company stock and consummated an exchange of thirty-eight shares of Atlantic Coast Line Railroad Company Class A stock for an equal number of shares of that company's common stock and also loaned to its subsidiary, the Polk Phosphate Company, in which it owned all of the stock, the sum of $700.

During the fiscal year ending June 30, 1934, plaintiff purchased United States Government Bonds of a value of $600,000, purchased $56,200 of its own certificates, sold 1,000 shares of Atlantic Coast Line Railroad Company common stock, sold United States Treasury Notes of a value of $400,000 and exchanged 162 shares of Atlantic Coast Line Railroad Company Class A stock for an equal number of shares of that company's common stock.

During the fiscal year ending June 30, 1935, plaintiff purchased its own certificates of indebtedness in the amount of $44,700.00, exchanged $200,000 United States Treasury Certificates for a like amount of United States Treasury Notes, loaned its subsidiary, the Polk Phosphate Company, $1,500.00, and authorized the purchase of the assets of the Northwestern Railroad Company of South Carolina and the sale of the same during the latter part of the calendar year 1935.

The plaintiff paid, under protest, the capital stock taxes for the three periods in question and filed claims for refund of such taxes. These claims were rejected by the Commissioner of Internal Revenue. In each instance the plaintiff complied with the requirements of the "Tucker Act", U.S.C.A. Title 28, §§ 41 and 763.

In view of these facts there is, in our opinion, no escape from the conclusion that the plaintiff during the periods in question was "carrying on or doing business" within the purview of the statutes above quoted, as interpreted by the decisions of the Supreme Court.

The question of the liability of a corporation for an excise tax levied for the privilege of doing business, was discussed by the Supreme Court in the case of Flint v. Stone Tracy Company, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312, where the court said [page 348]: "The act * * * does not impose direct taxation * * *," but on the contrary "may be described as an excise upon the particular privilege of doing business in a corporate capacity," and then went on to say:

" * * * It remains to consider whether these corporations are engaged in business. 'Business' is a very comprehensive term and embraces everything about which a person can be employed. Black's Law Dict. 158, citing People ex rel. Hoyt v. Tax Commissioners, 23 N.Y. 242, 244. 'That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit.' 1 Bouvier's Law Dict. p. 273."

In Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428, the court exempted a corporation from the tax for the reason, as stated in the opinion, that [page 362]:

"The corporation had practically gone out of business * * *, and had disqualified itself * * * from any activity * * *."

In McCoach v. Minehill & Schuylkill Haven Railroad Company, 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842, the court said [page 424]:

"The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business; in which event the investment income may be added to the business income in order to arrive at the measure of the tax; and (b) the receipt of income from property or investments by a company that is not engaged in business except the business of owning the property, maintaining the investments, collecting the income, and dividing it among its stockholders. In the former case the tax is payable; in the latter not."

In United States v. Emery, Bird, Thayer Realty Company, 237 U.S. 28, 35 S.Ct. 499, 59 L.Ed. 825, the court held the corporation exempt from the tax for the reason that the only business done by it was to keep up its corporate organization and to collect and distribute the rent received from its single lessee.

In Von Baumbach v. Sargent Land Company, 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460, the court said [page 204] "that the decision in each instance must depend upon the particular facts before the court." The court went on to say with respect to the decided cases:

"The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

The court also said that no particular amount of business was required to bring a company within the terms of the statute.

In the case of Edwards v. Chile Copper Company, 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678, the court said [page 346]:

"The cases must be exceptional, when such activities of such corporations do not amount to doing business in the sense of the statutes. The exemption 'when not engaged in business' ordinarily would seem pretty nearly equivalent to when not pursuing the ends for which the corporation was organized, in the cases where the end is profit. In our opinion the plaintiff was liable to the tax. We do not rest our conclusion upon the issue of bonds in the first year or the call loans made in the last, and for the same reasons we cannot let the fagot be destroyed by taking up each item of conduct separately and breaking the stick. The activities and situation must be judged as a whole."

In reviewing some of these decisions the United States Circuit Court of Appeals for the Third Circuit in Harmar Coal Company v. Heiner, 34 F.2d 725, certiorari denied 280 U.S. 610, 50 S.Ct. 159, 74 L.Ed. 653, said [page 728]:

"Following the Minehill decision lower courts were inclined—or induced—to broaden the range of non-taxable corporate activities until cautioned by the decision in Von Baumbach v. Sargent Land Company, 242 U.S. 503, 516, 37 S.Ct. 201, 61 L.Ed. 460, and checked by the decision in Edwards v. Chile Copper Company, 270 U.S. 452, 46 S.Ct. 345, 346, 70 L.Ed. 678, and Phillips v. International Salt Company, * * * 274 U.S. 718, 47 S.Ct. 589, 71 L.Ed. 1323."

In Phillips v. International Salt Company, 274 U.S. 718, 47 S.Ct. 589, 71 L.Ed. 1323, is found a state of facts very much like those in the instant case. The United States District Court for the Middle District of Pennsylvania held that the Salt Company was liable for the tax. 3 F.2d 678. The United States Circuit Court of Appeals reversed the District Court (3 Cir., 9 F.2d 389), and the Supreme Court reversed the Circuit Court of Appeals on the authority of Edwards v. Chile Copper Company, supra.

We held in Roney v. Helvering, Commissioner, 4 Cir., 67 F.2d 165, certiorari denied 290 U.S. 705, 54 S.Ct. 372, 78 L.Ed. 605, that "very slight activity constitutes 'doing business' when the end is profit." [page 166.]

On behalf of the plaintiff the case of Rose v. Nunnally Investment Company, 5 Cir., 22 F.2d 102, is cited as supporting the contention that the plaintiff was not doing business within the meaning of the statute but an examination of the facts in that case shows that they are different from the facts here.

Other decisions bearing on this point that we have considered are New Haven Securities Company v. Bitgood, 2 Cir., 87 F.2d 759; Argonaut Consolidated Mining Company v. Anderson, 2 Cir., 52 F.2d 55; Stanley Securities Company v. United States, Ct.Cl., 38 F.2d 907, certiorari denied 282 U.S. 845, 51 S.Ct. 25, 75 L.Ed. 750; Chevrolet Motor Company v. United States,

64 Ct.Cl. 211, certiorari denied 277 U.S. 585, 48 S.Ct. 432, 72 L.Ed. 1000; United States v. Three Forks Coal Company, 3 Cir., 13 F.2d 631; Eaton v. Phoenix Securities Company, 2 Cir., 22 F.2d 497, and United States v. Hotchkiss Redwood Company, 9 Cir., 25 F.2d 958.

In the year 1914 the plaintiff had virtually concluded the activities for which it was organized and instead of remaining inactive, only collecting the income from its holdings and distributing to the stockholders their share of that income, it was active in seeking to make other profits. Some of its properties were sold and the proceeds reinvested; it purchased railroad securities, invested in the Polk Phosphate Company, a subsidiary and during the period in question loaned it money. In the year 1929 its charter was amended to give it wider power in doing business. If, as contended, it had remained practically dormant after the year 1914 the purchase of railroad securities, engaging in the phosphate business, buying and selling Government securities and lendig money, all for a profit, were scarcely consistent with such a condition.

The paying of an annual sum of approximately $12,000 to its officers and employees and the creation of a surplus of $17,000,000, from its profits are not evidences of a dormant corporation.

As above quoted from the Von Baumbach Case, supra, it is not necessary that any particular amount of business be done to constitute "doing business". Here the plaintiff plainly "did business" during the three periods in question and was liable for the tax assessed. A judgment should have been entered in each of the three cases for the defendant.

Reversed.