Booth, Judge,
delivered the opinion of the court:
The Chevrolet Motor Company, a Delaware corporation, sues to recover $89,187.00 and interest thereon. The suit is predicated upon an alleged illegal assessment and exaction of capital-stock taxes made by the Commissioner of Internal Revenue upon the corporation’s tax return for the period July 1, 1920, to June 30, 1921.
The commissioner acted under section 1000 (a) of the revenue act of 1918 (40 Stat. 1057, 1126), which, in so far as pertinent, reads as follows:
“SectioN 1000 (a). That on and after July 1, 1918, in lieu of the tax imposed by the first subdivision of section 407 of the revenue act of 1916, (1) every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fair average value of its capital stock for the preceding year ending June 30 as is in excess of $5,000. In estimating the value of capital stock the surplus and undivided profits shall be included; * * * (c) The taxes imposed by this section shall not apply in any year to any corporation which shall not engage in business (or in the case of a foreign corporation not engaged in business in the United States) during the preceding year ending June 30.”
There is no jurisdictional question involved. The facts upon which the plaintiff now relies are substantially similar to the record before the commissioner and are not involved or disputed. The plaintiff’s corporate powers under its charter were extensive; primarily the purpose of its incorporation was to engage in the manufacture and sale of motor vehicles of all kinds. On May 1, 1918, the plaintiff sold and transferred to the General Motors Corporation, another Delaware corporation, all of its assets, except 450,000 shares *220 of the common stock of the General Motors Corporation which it then and had for some time owned. The consideration for the sale was the assumption of all outstanding liabilities of the plaintiff and the transfer to it of 282,684 additional shares of General Motors common stock. Subsequent to the close of this transaction the plaintiff continued ifs corporate entity and during the period here involved engaged in and completed the following activities, viz: It provided for the exchange of its shareholders’ stock for General Motors stock at the ratio of one share of its own stock for one and one-seventh shares of General-Motors stock and 44 cents in cajsh. In August and September, 1919, plaintiff borrowed $5,000,000 to enable it to exercise stockholders’ rights in acquiring additional General Motors common stock at less than its market value. In October, 1920, the plaintiff again borrowed $7,000,000 for the same purpose.
In October, 1919, the General Motors Corporation subscribed for 300,000 shares of stock of the Fisher Body Corporation of New York State at an agreed price of $92.00 per ¿share. Under the laws of New York the Fisher Body Corporation was precluded from accepting the notes of the General Motors Corporation for such amounts as the General Motors Corporation did not wish to pay in cash. In order to consummate the deal the General Motors Corporation arranged with the plaintiff to issue its notes to the Fisher Body Corporation for $22,840,000, which was done; $5,840,-000 of the total amoxmt of the indebtedness remained outstanding and unpaid to the plaintiff by the General Motors Corporation on June 30, 1921. On May 26, 1920, plaintiff again borrowed $4,500,000 to purchase an additional 150,000 shares of the common stock of the General Motors Coiporation. This purchase, as the proof shows, was made to prevent the sale of the stock involved in the open market and for fear of depressing the market price.
At another time later, actuated by the same intent, this plaintiff and a new corporation, known as the Du Pont Securities Company, a Delaware corporation organized for the express purpose of acquiring a large block of General Motors stock about to be sold in the open market, financed the purchase of the entire lot. The Du Pont Securities *221 Company obtained $20,000,000 witb which to make the purchase by issuing its notes and selling its stock for that amount, the plaintiff at the time loaning to the Du Pont Securities Company 549,453 shares of its common stock of the General Motors Corporation to pledge as collateral in securing in part the loan of $20,000,000 to the Du Pont Company, and in addition thereto subscribing for $2,800,000 worth of 8% preferred and 16,000 shares of no par value stock in the Du Pont Company. Subsequently this entire block of stock, together with 276,000 shares of General Motors common stock, was sold by the plaintiff to the E. I. du Pont de Nemours Company at a price of $13.00 per share for General Motors and $2,800,000 and accrued dividends for the Du Pont stock. The above transactions, so far as the record discloses, exhibit plaintiff’s activities during the period for which a refund of the tax hei’ein claimed was refused by the commissioner.-
Plaintiff’s case rests exclusively upon a contention that by the terms of the capital-tax statute it is expressly exempted from the payment of the tax, because for the period stated it was not “ carrying on or doing business ” within the meaning and intent of the law; that following the sale of its assets to the General Motors Company it was no more than a mere holding company, engaged in protecting its assets and liquidating its affairs. A great number of cases are cited to sustain its argument. Whatever may be the difficulty in applying the various precedents to the instant case, it must be conceded that the issue itself is not determinable from any fixed and inflexible rule, but is wholly dependent upon the particular situation which presents it. In most, if not all, of the cases the courts have been particular in laying down the rule that each case presents its own peculiar facts, and from these facts the question is alone determinable. Many close and doubtful cases have been before the courts, but where a manufacturing corporation, originally organized for profit and gain, continues after the disposition and sale of its good will and manufacturing assets to maintain its corporate entity and carry on with its remaining assets, engaging in business transactions inimical to the processes of final liquidation, all of which results in profit to its stock *222 holders, it can hardly escape the classification of doing business.
It is not the volume of business done, although in this case that is a most significant factor, but the real intent and purpose of the activities of the corporation and those engaged in its management and conduct. If the plaintiff had done no more than to receive and distribute dividends upon its General Motors stock to its shareholders and borrow funds to maintain and increase their value, the contention made for judgment in this case might be meritorious. But the findings disclose that it did a great deal mor'e. While it discontinued to manufacture motor vehicles, it did not reduce its activities to a mere holding company. It continued a series of business transactions designed 'and intended to facilitate the successful conduct of the corporation in which it owned a controlling stock interest, and loaned not only its valuable assets to enable the latter to finance vast and important business undertakings but served itself as a conduit, a subsidiary for the accomplishment of the purpose, and it is seemingly idle to contend that all this, involving millions of dollars, was done without hope or expectation of profit.
Deducible from the findings is a seemingly logical conclusion that plaintiff’s continuance as a corporation during this period of time served an extremely important purpose in aiding General Motors in its business activities and serving the Du Pont Securities Company in securing loans to finance its operations. While plaintiff’s1 officers drew no salary and it maintained no expensive organization and had reduced its overhead to the minimum, a fact accounted for in the transfer of the entire organization of the plaintiff to the General Motors Corporation on the date of sale, nevertheless it continued to function in a way that clearly demonstrates that what was done was not a mere passive, inert activity looking toward the liquidation of its assets or the usual activities of a holding company, but a lively participation in the activities of two other corporations linked with it, and whose success and profits redounded beneficially to the plaintiff. The plaintiff loaned its corporate powers to other corporations, engaged in and became an important instrumentality in their activities, and participated in their *223 business transactions. Surely this is carrying on business. If not, it is difficult to characterize it.
We are in accord with defendant’s contention and believe this case to be ruled by the principles announced in Von Baumbach, Collector, etc., v. Sargent Land Co., 242 U. S. 503, and Edwards v. Chile Copper Co., 270 U. S. 452.
The petition will be dismissed. It is so ordered.
Moss, Judge; Giiaham, Judge; and Campbell, Chief Justice, concur.
Hat, Judge, took no part in the decision of this case.