## CHICAGO STOCK YARDS CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 3730.

Circuit Court of Appeals, First Circuit.

July 24, 1942.

---

Joseph N. Welch, of Boston, Mass., George Wharton Pepper, of Philadelphia, Pa., Francis B. Keeney, of Providence, R. I., Edward J. Keelan, Jr., and L. E. Green, both of Boston, Mass., and Frederick H. Spotts, of Philadelphia, Pa., and Hale & Dorr, of Boston, Mass., for petitioner for review.

Carleton Fox, Sp. Asst. to the Atty. Gen., Samuel O. Clark, Jr., Asst. Atty. Gen., J. Louis Monarch, Sewall Key, and Helen R. Carloss, Sp. Assts. to the Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Claude R. Marshall, Sp. Atty., Bureau of Internal Revenue, both of Washington, D.C., for Commissioner of Internal Revenue.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This petition for review brings before us a decision of the Board of Tax Appeals entered March 29, 1941, determining that there are deficiencies in income tax of Chicago Stock Yards Company for the years 1930, 1932 and 1933 totaling $4,110,-120.70—for 1930, $1,817,686.10; for 1932, $1,145,322.68; for 1933, $1,147,111.92. The Board, four members dissenting, thus upheld a ruling by the Commissioner that petitioner had become subject to the 50% penalty tax (in addition to the normal corporate income tax) imposed upon corporations formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, as provided by the identical provisions of § 104 of the Revenue Acts of 1928 and 1932. 45 Stat. 814—15, 47 Stat. 195, 26 U.S.C.A. Int.Rev.Acts, pages 375, 508. Section 104 is copied in full in the footnote.[1]

Petitioner is the top holding company of what is called the Chicago Stock Yards Enterprise, a great integrated business owning or operating a stockyard, a belt line railway, an elevated street railway, a real estate development of considerable magnitude, power and light facilities, a national bank serving the stockyard area, and other related undertakings of minor importance.

---

[1] "§ 104. *Accumulation of Surplus to Evade Surtaxes*

"(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

"(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

"(c) As used in this section the term

'net income' means the net income as defined in section 21, increased by the sum of the amount of the dividend deduction allowed under section 23(p) and the amount of the interest on obligations of the United States issued after September 1, 1917, which would be subject to tax in whole or in part in the hands of an individual owner.

"(d) The tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year. Any amount so included in the gross income of a shareholder shall be treated as a dividend received. Any subsequent distribution made by the corporation out of the earnings or profits for such taxable year shall, if distributed to any shareholder who has so included in his gross income his distributive share, be exempt from tax in the amount of the share so included."

940

A diagram showing the organization of the Chicago Stock Yards Enterprise as of December 31, 1933, appears on the annexed insert. Reference is made to the findings

of fact of the Board below for details of the history and development of the numerous related corporations. 41 B.T.A. 590. The lines of development were dictated from time to time by legal and business requirements which need not be elaborated in this opinion.

The original operating company was the Union Stock Yards & Transit Company of Chicago, hereinafter referred to as the Transit Company, an Illinois corporation created in 1865, with a borrowing capacity limited by charter to $500,000. The greater part of the Transit Company's stockyard business was derived from the big meat packing companies which had plants in Chicago west of the stockyards, in an area known as Packingtown. In 1890 the packers threatened to move away unless they were given a share of the profits of the stockyards business; to underscore this threat they purchased and developed a tract of land in Indiana at a cost of about $1,000,000.

Since the Transit Company could not raise the funds necessary to buy off the packers, Mr. Frederick H. Prince and other Transit Company shareholders proposed the organization of a new corporation with sufficient resources to meet the emergency. As a result, the Chicago Junction Railways & Union Stock Yards Company, hereinafter called the Jersey Company, was incorporated in New Jersey in 1890, with a corporate life limited to expire on July 10, 1940. At all times its authorized and issued capital stock has consisted of 65,000 shares of preferred stock of $100 par value and 65,000 shares of common stock of $100 par value, each share of each class being entitled to one vote and the preferred stock being non-callable. It forthwith acquired 98% of the shares of the Transit Company, which, by the end of 1913, had become its wholly owned subsidiary. The Jersey Company in 1890 issued collateral trust bonds secured by Transit Company stock. It paid the various packers in cash and bonds the aggregate sum of $4,665,000 and thereby secured their commitment to keep their packing plants at Packingtown for a period of fifteen years.

With the expiration of the fifteen year period the packers were back again with their demands. Protracted negotiations followed. Finally, as a result of Prince's efforts, a new holding company for the enterprise, the petitioner, Chicago Stock Yards Company, was incorporated under the laws of Maine in 1911 with a cash capital of $1,000,000, and with broad power to purchase and lease real estate, to hold stocks and bonds of other corporations, to guarantee the obligations of others, and to carry on any other business which might seem to the company convenient to enhance the value of its properties. Prince became the owner of 80% of petitioner's capital stock, and Armour, the leading packer, the owner of 20%. The packers did not move away.

In 1920 Armour was ordered by a consent decree in the so-called Packers case to dispose of his shares in the Chicago Stock Yards Company. In 1922 Prince bought out Armour's shares in petitioner, with funds advanced by petitioner as a loan to Prince. Thus Prince became the sole stockholder in petitioner, and completely dominated its affairs thereafter. On June 1, 1932, F. H. Prince & Co., Inc., was organized under the laws of Maine, and its entire capital stock of 20,000 shares was issued for 48,000 common shares of petitioner owned by Prince. On June 3, 1932, Prince transferred to himself and his wife as trustees under a deed of trust, of which his relatives and friends were the beneficiaries, the 20,000 shares of F. H. Prince & Co., Inc., and since that date Prince has owned no stock in the latter company and the trustees have been the sole stockholders. This change in 1932 of the stock ownership in petitioner is assumed by both parties to be immaterial to the present litigation; in the deed of trust Prince reserved to himself the exclusive power to vote the 20,000 shares of stock of F. H. Prince & Co., Inc., and thus remained the dominant voice in petitioner.

Upon its formation in 1911 petitioner offered each common shareholder of the Jersey Company an option either (1) to have his common shares stamped with an agreement under which petitioner would guarantee such shareholder dividends of $9 per share on the Jersey Company common stock and the shareholder would assign to petitioner all dividends in excess of $9 per share, or (2) to exchange his shares for petitioner's 5% bonds on the basis of one share of Jersey Company common stock, par value $100, for $200 principal amount of petitioner's bonds, the bonds to be secured by the Jersey Company's common shares so exchanged. To provide for the purchase of all the Jersey Company's common stock under the second option above set forth, petitioner on October 2, 1911, executed a trust indenture authoriz-

ing the issuance of $13,000,000 5% 50-year callable gold bonds, secured by all the Jersey Company common shares owned or to be thereafter acquired by it. By August 31, 1914, petitioner had acquired in exchange for its bonds 31,075 Jersey Company common shares, and 33,922 shares had been stamped with the guaranty. During the succeeding years petitioner continually acquired more Jersey Company common stock, by purchase through the instrumentality of F. H. Prince & Co., a brokerage firm of which Prince was sole proprietor, and the principal business of which, apparently, was to facilitate operations of petitioner in connection with the stockyards enterprise. On December 31, 1929, petitioner had acquired 58,742 of the 65,000 shares outstanding. On December 31, 1933, it had acquired 60,336 shares, of which 31,310 were acquired in exchange for $6,262,000 par value of the petitioner's bonds and 29,026 for $4,979,352.19 in cash. In the years 1929–1933 petitioner acquired 2,362 shares of Jersey Company preferred stock at a total cost of $218,933.33; it had made no purchases of such stock prior to 1929.

At some indefinite time after petitioner's formation Prince set as a goal the liquidation of the Jersey Company upon the expiration of its charter in 1940, the payment at or before that date of all the debts of petitioner, the Jersey Company, and their subsidiaries, and the complete ownership by petitioner of the whole stockyards enterprise debt free, and with an adequate working capital. In his direction of the affairs of petitioner up through the end of 1933, the last tax year now in question, Prince drove consistently toward the attainment of that goal.

Prince has been president of petitioner from the start. He became president of the Jersey Company; also chairman of the board of the Transit Company and chairman of the board of the Chicago Junction Railway Company. He dictated the policies and supervised the operations of the Jersey Company and all of its subsidiaries as well as of the subsidiaries of petitioner. He was enabled to do this, as the Board stated in its opinion, "through ownership of all the stock of the petitioner, which had virtual control through stock ownership of the other corporations."

On October 1, 1914, petitioner and the Jersey Company made a so-called "By-Pass Agreement". Under this agreement the Maine Company guaranteed to the Jersey Company the payment of all the latter's expenses and the interest upon the Jersey Company's bonds; guaranteed all payments the Jersey Company might be required to make by virtue of its guaranty of the interest, but not the principal, of the real estate bonds of the Central Manufacturing District and of the bonds of the Chicago Junction Railroad Company (the Elevated Company);[2] and guaranteed further the payment of dividends of 6% per annum upon the outstanding preferred shares of the Jersey Company and 9% per annum on the Jersey Company common shares. The Jersey Company on its part assigned and transferred to petitioner "all of its right title and interest in and to any dividends that may hereafter be declared by the Transit Company and the Railway Company respectively and all its right title and interest in and to all income and surplus earnings of the said companies or either of them that may now or hereafter be divisible or distributable among the shareholders of the said companies or either of them in the form of dividends or otherwise subject however to all obligations and agreements respecting such dividends and income as may now exist." Further, "all income of the New Jersey Company hereafter received or collected by it from any source whatever shall be by it applied first to the payment of its own expenses and second to the payment of all taxes payable and chargeable to the New Jersey Company and the surplus if any then remaining shall be paid to the Maine Company [petitioner] upon its request but subject however to any agreements or obligations on the part of the New Jersey Company now existing."

The enterprise flourished. Petitioner proceeded to build up in its own treasury a strong position in cash and liquid assets, with a view to achieving the goal set for 1940. In general, petitioner did not permit the various subsidiary companies to make accumulations which would normally have been appropriate for their individual needs, but sucked up into its own treasury most of the available funds in the various component companies of the enterprise, and advanced funds to the subsidiaries as the

---

[2] The Jersey Company itself had guaranteed both the principal and interest of the District and of the Elevated Company bonds.

need arose.[3] In a supplemental finding of fact the Board found:

"During the years 1922 to 1933, inclusive, the petitioner withdrew from the Jersey Co. and its subsidiaries in dividends more than the net earnings of the Jersey Co. and its subsidiaries for that period available for distribution to the petitioner."

For that reason petitioner makes the point that it is misleading to focus on the large technical earnings of the petitioner considered alone and not as a part of the integrated enterprise. Thus in 1933 the income of petitioner was $2,243,840.98. Of this income $1,716,000 came in the form of dividends from the Transit Company paid directly to petitioner under the by-pass agreement, though the Transit Company for that year had a loss of $827,463.49; and $200,000 came from dividends declared by Produce Terminal Corporation which had income for that year of only $29,850.39. Under the circumstances the Transit Company and Produce Terminal might, with propriety, have refrained from declaring dividends during that year, which would have resulted in reducing the income of petitioner for 1933 below the amount ($400,000) which it actually paid out in dividends that year.

The situation of petitioner on December 31, 1929, was found by the Board to be as follows:

"The petitioner, upon a paid-in cash capital of $1,000,000, had an earned surplus of $19,615,905.69 and a capital surplus of $6,450. It owned all of the capital stock of Produce Terminal, carried at a value of $1,032,431.95, and Central Manufacturing District Co.,[4] carried at a cost of $506,488; 58,742 Jersey Co. common shares out of 65,000 outstanding, carried at a cost of $10,993,551.74; and 457 Jersey Co. preferred shares out of 65,000 outstanding, carried at a cost of $45,821.50. The Produce Terminal was a prosperous corporation. It had net earnings of $262,213.73 for 1929 and annual average earnings of $172,517.68 for the five-year period ended with

1929. It paid dividends to the petitioner from 1928 to 1933, inclusive, at the rate of $200,000 per annum. Its excess of assets over liabilities at December 31, 1929, was $2,552,017.05, although carried on the petitioner's books at a value of $1,032,431.95.

"The petitioner had outstanding at December 31, 1929, 5 per cent bonds in the amount of $3,227,000. Its excess of assets over all liabilities, including its capital stock on that date, was $19,622,355.69."

As of the close of the year 1929 the program above indicated called for the accumulation by 1940 of cash and liquid assets to take care of the following:

| | |
|---|---|
| Bonds of petitioner maturing 1961 | $ 3,227,000 |
| Bonds of Jersey Company maturing April 1, 1940 | 14,000,000 |
| Debenture notes of Transit Co. maturing 1930 | 500,000 |
| Bonds of Elevated Company maturing 1945 | 2,327,000 |
| Bonds of District maturing up to 1941 | 3,909,000 |
| Total bonded indebtedness | $23,963,000 |
| Preferred stock Jersey Co. (64,543 shares) | 6,454,300.00 |
| Common stock Jersey Co. (6,258 shares) | 1,034,134.50 |
| Working capital | 5,000,000.00 |
| Total objective of the plan | $36,451,434.50 |

The following liquid assets were at that date available in the enterprise for the execution of the program:

| | |
|---|---|
| Petitioner | |
| Cash | $ 6,689,304.26 |
| Accounts receivable | 252,447.08 |
| Notes receivable (Prince) | 3,104,400.00 |
| District 6's 1930 | 27,000.00 |
| District 5's | 55,733.00 |
| Transit Co. 5 1/2's | 15,022.50 |
| Other investments | 1,467,338.35 |
| Produce Terminal | |
| Cash | 499,575.93 |
| Total | $12,110,821.12 |
| Jersey Co. and subsidiaries* | 9,594,363.94 |
| Total | $21,705,185.06 |

*Includes impounded charges of $2,013,523.54 which were not released to the Transit Co. until 1932.

At the end of 1933 the liquid assets of petitioner had increased about $2,000,000

---

[3] Thus in the years 1930–1933 petitioner lent to Central Manufacturing District amounts as follows: 1930, $800,000 to meet the District's maturing bonds; 1932, $275,000 to meet bonds maturing in that year and $275,000 to assist in the erection of a building upon land sold by the District; 1933, $275,000 to meet maturing bonds. Petitioner lent to the Pau Corporation, for the purpose of purchas-

ing machinery installed in the plant of Produce Terminal, $189,503.34 in 1932 and $47,033.17 in 1933.

[4] A company of no present importance, not to be confused with Central Manufacturing District, a Massachusetts Trust owning and developing tracts of land adjoining the stockyards with a view to building up additional tonnage for the Railway Company.

but this was swallowed up by a decrease of $4,000,000 in the liquid assets of the enterprise as a whole. Thus, though the obligations of the whole enterprise had decreased by about $3,000,000, the excess of its obligations over the liquid assets available had increased by about $1,000,000 as of December 31, 1933. This was due chiefly to the fact that petitioner and certain subsidiaries had been obliged to sink millions of dollars into various stockyard banks in order to prevent their failure and consequent shock to the stockyards enterprise. In respect to the bank crisis the Board made the following findings:

"During the years 1930, 1931, 1932, and 1933 the petitioner, the Jersey Co., and some of that company's subsidiaries had large deposits in banks in the stockyards district or its vicinity. The petitioner and some of the subsidiaries of the Jersey Co. owned shares of stock in such banks. If the banks failed the depositors stood to lose a large part of their deposits and the stockholders might be subject to a 100 per cent assessment upon their stock. Prince believed that it was necessary to protect these banks. He was particularly interested in maintaining the solvency of the Stock Yards National Bank, which was known throughout the country as the Stock Yards Bank. The failure of that bank would be a serious blow to the Jersey Co. and its subsidiaries.

"In order to assist the banks the Transit Co. in 1930 paid $464,000 for shares of capital stock of Stock Yards National Bank and purchased real estate bonds from the Stock Yards Trust & Savings Bank for $100,000.

"In 1931 Produce Terminal purchased from the Central Manufacturing District Bank real estate bonds for $490,000 cash. In 1932 the petitioner purchased notes of individuals and corporations from the Central Manufacturing District Bank, paying therefor $501,439.58. These were carried in its balance sheet at December 31, 1932, at a value of $327,307.55. The petitioner loaned $3,071,779.19 to the Stock Yards National Bank and the Stock Yards Trust & Savings Bank. The Transit Co. during this year purchased debentures of the Stock Yards Investment Co., an affiliate of the Stock Yards National Bank, for $1,340,000 and Produce Terminal purchased similar debentures for $350,000.

"In 1933 the Transit Co. loaned to the Stock Yards Bank & Trust Co. $1,016,-414.84 in Government bonds. This loan became a loss to the Transit Co. in 1933. The banks needing further assistance, the petitioner agreed to subordinate $1,800,000 of its deposits in the Live Stock National Bank to the claims of other depositors. The Transit Co., Produce Terminal, and District likewise subordinated deposits in the amounts of $1,300,000, $300,000, and $600,000, respectively. The subordinated deposits were to be paid only out of certain assets which the bank was not allowed by the bank examiners to treat as good assets. The agreement for the subordination of the deposits was that the repayment would be made by the bank out of recoveries from unacceptable assets which were written off on the books of the bank, such recoveries to be applied, in the first instance, to the amounts subordinated by the petitioner. * * *

"Western Associates, Inc., a corporation wholly owned by the petitioner, was organized in January 1933 under Delaware law to enable the petitioner to hold the shares of the Stock Yards Bank & Trust Co., which was formed on January 1, 1933, as a consolidation of the Stock Yards National Bank and the Stock Yards Trust & Savings Bank, and later to hold the shares of the Live Stock National Bank of Chicago. It received $1,500,000 from the petitioner on the issue of its 40,000 shares of capital stock and immediately paid it to the Stock Yards Bank & Trust Co., a bank organized under Illinois law and located in the stockyards district of Chicago, for 40,000 shares of that corporation's capital stock. In April 1933 the Stock Yards Bank & Trust Co. was reorganized, and Western Associates, Inc., received in exchange for the shares of that bank 40,000 shares of the capital stock of the resulting Live Stock National Bank of Chicago. Western Associates, Inc., has owned these shares since that time."

During the years 1930–1933 there grew up among the packers a practice of buying livestock directly from the farmers in the country, shipping to smaller stockyards and conveying it by truck to the packing houses, thereby avoiding the Chicago stockyards entirely. Packing houses had also been built in Iowa and southern Minnesota, causing a shrinkage in the revenue of the Chicago stockyards in the years 1930–1933. As found by the Board: "In 1932–1933 Prince, with the funds in the form of notes furnished by the petitioner, purchased $1,-000,000 of stock in Armour & Co., sufficient

to enable him to become chairman of the board of directors of that company and retain its business for the Chicago stockyards."

From 1924 and on through 1933 petitioner followed a consistent policy of paying out $400,000 annually in dividends, which is at the rate of 5% on the par value of its capital stock. The net income of the petitioner (considered alone and not as part of the whole enterprise) and the dividends paid by it in the years 1911–1933, were as follows:

| Year. | Net earnings. | Dividends paid. | Excess of net earnings. |
|---|---|---|---|
| 1911–1929 | $24,375,905.69 | $4,760,000 | $19,615,905.69 |
| 1930 | 3,468,336.80 | 400,000 | 3,068,336.80 |
| 1931 | 2,358,232.14 | 400,000 | 1,958,232.14 |
| 1932 | 2,172,963.09 | 400,000 | 1,772,963.09 |
| 1933 | 2,243,840.98 | 400,000 | 1,843,840.98 |

Thus the net earnings of the petitioner for the four years 1930–1933 were $10,243,-373.01. Of these earnings $1,600,000 was paid out in dividends, $8,069,074.36 is represented by an increase in assets, and $574,298.65 went in reduction of liabilities.

If petitioner had distributed its whole net income for each of the years 1930, 1932 and 1933, the surtax liability of F. H. Prince would have been increased as follows:

| 1930 | $572,234.91 |
|---|---|
| 1932 | 386,582.33 |
| 1933 | 377,706.61 |

The stockholders of petitioner did not report any of the undistributed earnings of that company in the years 1930, 1932 and 1933 under the provisions of § 104(d) of the Revenue Acts of 1928 and 1932.

The Board made its concluding findings as follows:

"During the years 1930, 1932, and 1933 the petitioner was a mere holding or investment company.

"During the years 1930, 1932, and 1933 the petitioner permitted its gains and profits to accumulate beyond the reasonable needs of its business.

"During the years 1930, 1932, and 1933 the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its stockholders through the medium of permitting its gains or profits to accumulate instead of being divided or distributed."

Under § 104 the tax is not imposed upon a mere showing that the accumulation of earnings resulted in a saving of surtaxes to the shareholders; the section requires, further, the ascertainment of a subjective state —a specific purpose in the mind of the person or persons who made the corporate decision to accumulate earnings rather than to distribute them. The genesis of § 104 is found in the very similar language of the Tariff Act of 1913, 38 Stat. 166–167. That act, however, imposed the additional tax on the shareholders rather than on the corporation. The same was true in the Revenue Act of 1916, 39 Stat. 758, and in the Revenue Act of 1918, 40 Stat. 1072; but § 220 of the latter act struck out the word "fraudulently" from the phrase "fraudulently availed of" which appeared in the earlier acts. In the 1921 Act, 42 Stat. 247–48, the incidence of the tax was shifted to the corporation. When the 1924 Act was pending, complaints were made of the ineffectiveness of the penalty tax, due to the fact that it depended upon the finding of a specific forbidden purpose. See Sen.Rep. No. 398, 68th Cong., 1st Sess., p. 9; 65 Cong.Rec. 7360. Nevertheless, the tax was reenacted, with an increase in the rate from 25 to 50 per cent. 43 Stat. 277, 26 U.S.C.A. Int.Rev. Acts, page 31. Its shortcomings were again discussed when the 1928 Act was pending (see 69 Cong.Rec. 519–21, 7976–77), but neither in that year, 45 Stat. 814–15, nor in 1932, 47 Stat. 195, was any substantial change made. The corresponding sections of the 1934 and 1936 Acts, 48 Stat. 702, 26 U.S.C.A. Int.Rev.Acts, page 690, and 49 Stat. 1676, 26 U.S.C.A. Int.Rev.Acts, page 851, introduced a graduated rate turning on the amount of profits undistributed, but left in the requirement as to purpose, despite the fact that the House Report in the latter year recorded that the difficulty of proving the specific purpose had rendered the section more or less ineffective. H.Rep. 2475, 74th Cong., 2d Sess., p. 5. Finally, however, the 1934 Act took cognizance of the inadequacies of the existing law by imposing a new tax, a high surtax on the undistributed profits of "personal holding companies," that is, corporations 80 per cent of whose gross income for the taxable year is derived from royalties, dividends, interest, annuities, or gains from the sale of stock or securities, and whose stock to the extent of more than 50 per cent is owned by not more than five individuals. 48 Stat. 751–52, 26 U.S.C.A. Int.Rev.Acts, page 757. This tax was aimed especially at the "incorporated pocketbook" (H.Rep. 704, 73d Cong., 2d Sess., p. 11), and was imposed upon the undistributed profits as such, without

regard to the purpose of the accumulation. See Noteman v. Welch, 1 Cir., 1939, 108 F.2d 206. The 1936 Act imposed still another tax, a somewhat lower surtax on undistributed profits of corporations generally (other than personal holding companies), again without regard to purpose. 49 Stat. 1655–57, 26 U.S.C.A. Int.Rev.Acts, page 823.

From this review of the legislative history it is apparent that in applying § 104 of the Revenue Acts of 1928 and 1932, care must be observed not to confuse the *effect* of the accumulation on shareholders' surtaxes with the *purpose* of the accumulation. This section of the 1928 and 1932 Acts cannot be read and applied so as to do the job of § 351 of the 1934 Act (the surtax on personal holding companies, now §§ 500–511, Int.Rev.Code, 26 U.S.C.A. Int.Rev. Code, §§ 500–511) or of § 14 of the 1936 Act (the surtax on undistributed profits of corporations generally).

■ The ascertainment of purpose, under § 104, involves a finding of fact, and none the less so because the fact happens to be a state of mind. Necessarily, a state of mind can generally be proved only by inference from circumstantial evidence, for direct testimony of what was in a man's mind can only come from the man himself.[5] Within the area in which reasonable men might differ as to the proper inference to be drawn, the Board's inference of purpose cannot be reviewed by us, Congress having chosen to provide that the courts may modify or reverse a decision of the Board only if the decision "is not in accordance with law", 44 Stat. 110, § 1003(b), Int.Rev.Code, § 1141(c) (1), 26 U.S.C.A. Int.Rev.Code, § 1141(c) (1). "It is the function of the Board, not the Circuit Court of Appeals, to weigh the evidence, to draw inferences from the facts, and to choose between conflicting inferences." Wilmington Trust Co. v. Helvering, April 27, 1942, 62 S.Ct. 984, 986, 86 L.Ed. ——. This has been applied, specifically, to a finding by the Board of Tax Appeals of the existence of the forbidden purpose described in § 104. Helvering v. National Grocery Co., 1938, 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346; Olin Corp. v. Commissioner, 7 Cir., 1942, 128 F. 2d 185; Wilkerson Daily Corp., Ltd., v. Commissioner, 8 Cir., 1942, 125 F.2d 998, 1000; United Block Co. v. Helvering, 2 Cir.,

1941, 123 F.2d 704; Commissioner v. Cecil B. De Mille Productions, Inc., 9 Cir., 1937, 90 F.2d 12. Nor is the rule any different, as petitioner contends, when the subsidiary facts are undisputed. Wilmington Trust Co. v. Helvering, supra.

■ Petitioner makes the further point that we are free in this case to draw our own inference as to purpose, upon review of the evidence de novo, since the decision below was made by the votes of members of the Board who did not hear the witnesses, over the dissent of the Board member who sat at the hearing. We know of no authority to sustain this contention. The inference of purpose drawn by the Board is still a finding of fact, though derived from a record made up of testimony and documentary evidence presented before a single member. Certainly this court is in no better position than was the Board to draw the correct inference from the facts in the printed record. A similar situation is found in cases under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., where the testimony, customarily, is heard by a trial examiner. In Nevada Consolidated Copper Corp. v. National Labor Relations Board, 10 Cir., 1941, 122 F.2d 587, the issue whether the employer was guilty of an unfair labor practice depended upon a finding of the employer's purpose in refusing to reemploy a number of its former employees after a shutdown. The Board, upon the record made before the trial examiner, found that the employer had discriminated against the men in order to discourage membership in a certain labor union. See 26 N.L.R.B. 1182, 1186. The circuit court of appeals refused to enforce the Board's order, concluding that its findings were not supported by substantial evidence, and stating: "When the evidence is consistent with either of two inconsistent hypotheses, it establishes neither." 122 F. 2d at page 595. On certiorari the Supreme Court reversed the judgment below with directions to enforce the Board's order. National Labor Relations Board v. Nevada Consolidated Copper Corp., April 27, 1942, 62 S.Ct. 960, 961, 86 L.Ed. ——. The court stated: "There was also substantial evidence from which the Board could have concluded, as it did, that respondent's motive for refusing the employment was discouragement of membership in a labor un-

---

[5] The Board was not bound to accept as true Prince's testimony disclaiming any purpose on his part to avoid the imposition of surtaxes. Helvering v. National Grocery Co., 1938, 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346.

ion. The possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them, as the court below seems to have thought." See, also, National Labor Relations Board v. Burry Biscuit Corp., 7 Cir., 1941, 123 F.2d 540, 543.

Since petitioner was incorporated in 1911, prior to the passage of the 16th Amendment, it is obvious that it was not formed for the condemned purpose of diminishing the surtaxes of its stockholders.

On the issue whether petitioner was "availed of" for that purpose during the years now in question, petitioner makes an argument which it earnestly insists is conclusive in its favor as a matter of law. It is said that the plan of accumulation toward the 1940 goal was inaugurated prior to the passage of the 16th Amendment and that therefore the plan in its inception could not have been devised for the interdicted purpose; that if the plan was bona fide when formed, "and if the accumulation was carried out in honest accordance with it, then it must follow that the corporation was always availed of for only one purpose— *and that was the carrying out of the plan*"; that Congress in § 104 could never have intended that the abandonment in midpassage "by any type of company of a pre-existing policy of lawful accumulation should be the only means of escape from a penalty tax predicated upon a purpose of evasion."

We have at least two difficulties with this line of argument.

In the first place, though petitioner was organized in 1911, the record fails to establish just when the plan of accumulation toward the glittering goal of 1940 was conceived. There appears to be no contemporaneous documentary evidence of the plan. Prince himself testified that "after the Maine Company [petitioner] was formed," he and Mr. Armour talked the matter over, "and we realized that in 1940, it would be advisable to liquidate the Jersey Company * * *." The word "after", of course, is indefinite enough as to time;[6] furthermore, whenever the purpose to prepare for the liquidation of the Jersey Com-

pany in 1940 may have been formed, it by no means follows that the idea crystallized at the same time to accumulate such huge funds in petitioner's treasury as would enable petitioner to be the sole owner of the vast stockyards enterprise wholly debt free in 1940. As a matter of fact, petitioner had no net income in 1911 or 1912. It was not until 1913 that it had any profits to accumulate; in that year it had a net income of $2,429,105.18, and paid out in dividends $200,000. Thus, at the time when petitioner actually began to accumulate profits there was on the books the first federal income tax law, imposing modest graduated surtaxes upon individual incomes. 38 Stat. 166. There was, then, even at that early date, a conceivable tax motive for allowing corporate profits to be accumulated instead of being distributed to the shareholders, a motive which Congress at that time anticipated and sought to discourage.

In the second place, even if the plan of accumulation had been inaugurated in 1911, necessarily for some purpose other than that forbidden in § 104, it would not follow as a matter of law that the continued execution of the plan in the years now in question could not have been motivated by two or more purposes, one of them the forbidden purpose. For example, suppose that A in 1911 created the X Corporation, of which he became the sole stockholder, and conveyed to it large holdings of corporate stock and securities, with the plan of having the X Corporation accumulate and reinvest all the income from such securities, and in the expectation of leaving to his son at his death a huge fortune in the form of stock of the X Corporation. Such a plan of accumulation would have had an innocent purpose at its inauguration; but if the plan were continued in execution by the dominant stockholder during the succeeding thirty years, the facts would surely warrant an inference that in the latter years the corporation was availed of at least in part for the purpose of diminishing A's surtaxes.[7] It has been held that the tax under § 104 cannot be avoided unless the corporation succeeds in establishing that the purpose of the accumu-

---

[6] In its statement of points, petitioner charges the Board with error in failing to find as a fact that "Mr. Prince and the others in authority here had an expectation during the years *1920* to *1933* inclusive, to liquidate the Jersey Company." [Italics ours.]

[7] In National Grocery Co. v. Commissioner, 1936, 35 B.T.A. 163, the corporation was organized in 1908 for the purpose of operating a chain of grocery stores. The Board found that there had been an accumulation during 1931 for the forbidden purpose and sustained the tax.

lation was "wholly other than that of preventing surtax upon its shareholders—not only that there was another purpose, but that there was a complete absence of the disapproved purpose." R. L. Blaffer & Co. v. Commissioner, 37 B.T.A. 851, 856, affirmed 5 Cir., 103 F.2d 487, certiorari denied 308 U.S. 576, 60 S.Ct. 91, 84 L.Ed. 483, rehearing denied 308 U.S. 635, 60 S.Ct. 135, 84 L.Ed. 528. See Williams Investment Co. v. United States, Ct.Cl.1933, 3 F.Supp. 225, 232. Perhaps this is too strong a statement; but at least it is clear that § 104 would apply if in the totality of reasons which induced the continuing of the accumulation the forbidden motive of surtax avoidance played a substantial part. Cf. Farmers' Loan & Trust Co. v. Bowers, 2 Cir., 1938, 98 F.2d 794, 798, certiorari denied 1939, 306 U.S. 648, 59 S.Ct. 589, 83 L.Ed. 1047; Baskes v. Cushing, 1930, 270 Mass. 230, 233, 170 N.E. 42.

■■ In ascertainment of the existence of the forbidden purpose, § 104(b) provides a procedural aid: "The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax." This is spoken of as a "presumption" in Helvering v. National Grocery Co., 1938, 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346. The normal function of a presumption is to assist the party having the burden of proof; the other party, if he would hope to prevail, must "show his hand" (United Business Corp. v. Commissioner, 2 Cir., 1933, 62 F.2d 754, 755), that is, he must go forward with evidence warranting a finding contrary to the presumed

fact. If he does this, his adversary, having the burden of proof, must then satisfy the trier of the facts on the preponderance of the evidence. But where a taxpayer petitions the Board for redetermination of a deficiency found by the Commissioner, the taxpayer has the burden of proving that the Commissioner's determination was wrong. Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Helvering v. Taylor, 1935, 293 U.S. 507, 515, 55 S.Ct. 287, 79 L.Ed. 623. The taxpayer in any such case must necessarily "show his hand," and more. Therefore, so far as the presumption is concerned, § 104(b) would seem not to amount to much;[8] it is more "like a handkerchief thrown over something also covered by a blanket." Brown v. Henderson, 1934, 285 Mass. 192, 196, 189 N.E. 41, 43.

■ The Board found that the petitioner, during the years in question, "was a mere holding or investment company." We do not think that this is a permissible finding on the record, particularly in view of the subsidiary facts found by the Board. See Industrial Bankers Securities Corp. v. Higgins, 2 Cir., 1939, 104 F.2d 177. Cf. Chevrolet Motor Company v. United States, 64 Ct.Cl. 211, 222, certiorari denied 1928, 277 U.S. 585, 48 S.Ct. 432, 72 L.Ed. 1000.

The logical core in the presumption as to a "mere holding company" is that a company which does nothing but hold securities and collect the income therefrom has no need to build up any accumulation of profits; and that if such a company does so, that fact in itself is persuasive evidence that the accumulation was for the purpose of saving surtaxes to the shareholders. The Board said in its opinion: "As a holding company,

Seven members of the Board dissented, including three of the four members who dissented in the case at bar. The dissenting opinion made the argument advanced by petitioner in the present case: "The corporation merely continued its long established practice of 'plowing its earnings back into the business'. Indubitably it had in the earlier years no 'purpose of preventing the imposition of the surtax upon its shareholders', for there was no surtax to escape. There had been no 'sudden change of policy, coincident with large increases in the surtax rates (which) might * * * betray a purpose to accumulate against a season more propitious for distribution.' (United Business Corporation [v. Commissioner, 2 Cir., 62 F.2d 754], supra.) It had pursued the

same policy throughout the years." Nevertheless, the Supreme Court upheld the Board's decision. Helvering v. National Grocery Co., 1938, 304 U.S. 282, 58 S. Ct. 932, 82 L.Ed. 1346.

[8] The Revenue Act of 1938, 52 Stat. 483, 26 U.S.C.A.Int.Rev.Acts, page 1039, amended the section so as to provide that the fact of unreasonable accumulation "shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." By this amendment the presumption seems to have the effect of increasing the taxpayer's normal burden of proof by requiring a greater quantum of proof to sustain the burden.

the petitioner had no need for the accumulation of gains and profits." [41 B.T.A. 590.] The corresponding phrase in the original income tax law was "a mere holding company." 38 Stat. 167. It remained so until the Revenue Act of 1934, which amended the phrase to read "a mere holding or investment company." 48 Stat. 702. This was done at the behest of the Treasury, which had had difficulty "in applying this section in the case of pure investment companies which invest their entire net income." House Rep. No. 179, 68th Cong., 1st Sess., p. 22. The Secretary of the Treasury thought that under the provisions of the earlier acts it was questionable whether any investment company could have a surplus beyond the reasonable needs of its business, since its sole business was to invest. 65 Cong.Rec. 7354-55.

In the present case, petitioner was formed to be the directing head of the whole integrated enterprise, supplanting, in that respect, the Jersey Company, which became a "mere shell." Its purpose was to keep the enterprise intact, not to milk it dry and allow it to disintegrate in 1940. The commitments petitioner made in 1911 by guaranteeing dividends of 9 per cent on the common stock of the Jersey Company, and the guarantee it made in the "by-pass agreement" of 1914, made it necessary for petitioner, in protection of its investment, to exercise an active supervision over the underlying operating companies, whose continued success was so vital to its own financial health. Since, under the by-pass agreement, it drew up into its own treasury the earnings of the subsidiary companies without allowing the individual companies to make the accumulations which they normally would have needed for their own corporate purposes, petitioner, as banker for the enterprise, necessarily had to have a very substantial accumulation of funds at its disposal.

Considering petitioner's activities and commitments, it seems to us to be a good deal more than a "mere holding company" having "no need for the accumulation of gains and profits." Certainly, from the businessman's point of view, petitioner's business is the business of the stockyards enterprise as a whole. The enterprise is a close-knit organism composed of many corporate members, of which petitioner is the corporate head, supplying the direction and coordination. This appears clearly enough from the facts already stated, and in the Board's findings, not previously quoted:

"Until his death in 1926 J. A. Spoor was president of the Transit Co. and in complete control of the Transit Co., Railway Co., and Elevated Co. He sent reports to F. H. Prince & Co. in Boston. After Spoor's death Prince became chairman of the board of directors of the Transit Co. and *representatives of the petitioner went to Chicago with increasing frequency, giving orders and directions.*[9] [Italics ours.] There was daily contact by telephone between the men operating the companies in Chicago and the officers of the petitioner. Prince handled the stockyards banking situation from 1930 to 1933. Ultimate choice as to officers, directors, and other personnel was dictated by Prince and he decided dividend policies. He also gave instructions as to the banks in which funds were to be deposited and his authority was necessary for unusual expenditures by the Transit Co. After the destruction of part of the stockyards by fire, the president and vice president of the petitioner went to Chicago and gave orders as to what buildings should be rebuilt and how. The yards were not entirely restored. The restoration was paid for with insurance funds received by the Transit Co. In certain instances suggestions of the officers in Chicago were rejected by Prince. In 1933 Prince refused to permit the Transit Co. to spend enough money to build fireproof hog and sheep houses requested by the men in Chicago. Prince granted permission to rebuild the amphitheatre in which the International Live Stock Exposition was held.

"Produce Terminal, the Transit Co., the District, and the Railway Co. sent to the petitioner monthly reports showing a summary of operations, which, except for the District's report, were copies of reports required by the Illinois Commerce Commission, the form of reports by the Transit Co. having been devised by its auditors. The petitioner assisted the District on many occasions in financing the construction of buildings. In 1932 it furnished between $300,000 and $400,000 for one building."

Notwithstanding this, the Board says in its opinion: "It does not appear, however, that the petitioner supervised and managed

___

[9] A. G. Leonard, who succeeded Spoor as president of the Transit Company, testified: "Well, the Maine Company [petitioner] was practically in the saddle, and I was about the hired man."

950

the operations of its subsidiaries and those of the Jersey Co. and its subsidiaries. Prince did this himself." How else could petitioner act except through the human beings who were its officers? Every corporation is controlled by some human being or group of human beings, but it is of the essence of the corporate privilege that the acts of the human beings in the exercise of the corporate powers are attributed to the corporation as a separate legal entity. It is all right to speak of petitioner as "Prince in corporate clothes"—so, if a partnership of fifteen members incorporates, the corporation may be described as the partnership in corporate clothes. This does not advance the argument much. Prince's stock ownership enabled him to sit in the driver's seat as president of petitioner. In that capacity he exercised petitioner's corporate powers. Among these powers, as the Board itself said, was petitioner's "virtual control through stock ownership of the other corporations" in the enterprise. It is of no significance in this connection that "petitioner received no fees for management and supervision"; under the circumstances this would have been a superfluous bookkeeping formality. Nor is it important that petitioner "had practically no office expenses", and no large force of employees. For general supervision of the enterprise it needed only the brains of an executive of high caliber. Prince has been receiving $50,000 a year as president, and petitioner has regularly deducted this expense on its income tax returns, without challenge from the Commissioner, so far as appears.

As to the "presumption" predicated upon a finding that profits have been permitted to accumulate beyond the reasonable needs of the business, this again has a logical core which would have had significance even without the specific provision in § 104(b), for if the accumulation cannot be accounted for as in response to business needs this fact may be persuasive evidence that the accumulation was for the purpose of saving surtaxes to the shareholders. The weight of such evidence would vary with the circumstances. For instance, the inference of forbidden purpose would more readily be drawn where the sole or dominant stockholder, who would profit greatly by a saving of surtaxes, is himself the human being who made the corporate decision to accumulate rather than to distribute, than it would be where the stock was held by a large number of persons

in comparatively small blocks. Again, the greater the percentage of accumulation over reasonable business needs, the stronger becomes the inference of forbidden purpose, other things being equal.

As already indicated, the fact that the profits have, or have not, been accumulated in excess of reasonable business needs is not the ultimate operative fact upon which the penalty tax in § 104(a) depends. Thus, though the accumulation may have been within the reasonable needs of the business, judged by objective standards, the other evidence might indicate that the directors, in deciding to withhold the distribution of dividends, were concerned not so much with providing for business needs (as to which, as a matter of judgment, they may have been in doubt) as with the desire to avoid heavy surtaxes to shareholders. See United Business Corp. v. Commissioner, 2 Cir., 1933, 62 F.2d 754, 755. On the other hand, even where the accumulation may be in excess of reasonable business needs, judged by objective standards, the other evidence might indicate that the directors, in deciding upon the accumulation, were influenced solely by their sincere, though mistaken, judgment as to the extent of the business needs, and were not affected at all by a consideration of the incidental effect on shareholders' surtaxes. Of course, human nature being what it is, a finding to that effect would be quite unlikely in a case where the corporate decision was made by a sole or dominant stockholder who stood to gain by the withholding of distribution.

We agree with petitioner that the Board, in arriving at its finding that profits were accumulated beyond the reasonable needs of the business, used an improper "legal yardstick" by which to measure those needs.

In its opinion the Board stated (1) that as a holding company, petitioner "had no need for the accumulation of gains and profits"; (2) that even as a management company it had no need "for the accumulation of a large surplus", for the only expenses connected with the management were the payment of salaries and wages in the amount of $52,500 per year, and the annual income amply provided that revenue; (3) that it had no need of an accumulation "for the purpose of financing other corporations", for it was not obligated on the principal of any bonds other than its own, and so far as concerned its

guaranty of interest on the bonds of the Jersey Company and its subsidiaries, "petitioner had never been required to pay out a dollar under its guaranty"; (4) that as respects its own bonds petitioner already had on hand at the close of 1929 more than twice as much cash as was necessary to redeem them; (5) that "there was no reasonable need for the petitioner to acquire the balance of the common stock and the outstanding preferred shares in the Jersey Co.", for amounts spent in the acquisition of those shares "simply represented investments by the petitioner"; (6) that the same also is true of any amounts expended in acquiring the bonds of the Jersey Company and its subsidiaries, for these bonds "were well secured by deposit of collateral"; (7) that petitioner had no reasonable need to make provision for the liquidation of the Jersey Company in 1940; (8) that in any event there was no indication of the "need * * * for any further accumulation * * * during any of the years 1930, 1932, and 1933."[10]

■ The narrow view of petitioner's needs thus taken by the Board proceeded from a failure to recognize petitioner's business as that of the stockyards enterprise as a whole. Accumulation "for the reasonable needs of the business" is not limited to making provision for the bare legal obligations of the corporation but may include accumulation in furtherance of a reasonable business program for protection and enhancement of the corporation's pecuniary interests. Furthermore, considering only petitioner's strictly legal obligations, it may well be that petitioner, in view of its course of conduct under the by-pass agreement, was legally obliged to safeguard the interests of stockholders and creditors of the Jersey Company and its subsidiaries. See Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; Vallery v. Denver & Rio Grande R. Co., 8 Cir., 1916, 236 F. 176.

■ The corporate needs must be judged from the standpoint of the corporation doing business as a legal entity separate and distinct from its shareholders. It is hardly fair to argue as the Board does: "It was of no moment to Prince whether the earnings of the petitioner were carried in his individual pocketbook or in his corporate pocketbook, except that if they had been received in the first instance in his individual pocketbook or distributed to him by the petitioner, he would have been subjected to heavy surtaxes upon them, while he avoided such surtaxes by retaining them in the corporation." Prince is mortal; petitioner is endowed with at least potential immortality. A corporation would not be providing adequately for its own needs and legal commitments if it paid out all of its earnings in dividends and relied upon its stockholders coming to its rescue as the need arose.

Petitioner controls and directs the stockyards enterprise. It has a legitimate business need to preserve that control, and to keep the enterprise intact as a going concern. Petitioner's own bonds are secured by pledge of its Jersey Company stock. It is true, as the Board says, that the $14,000,000 of Jersey Company bonds were well secured by collateral. That collateral, however, included all of the stock of Chicago Junction Railway Company and practically all of the stock of the Transit Company, the sale of which would have resulted in the dismemberment of the enterprise.

Planning for the liquidation of the Jersey Company in 1940 was for petitioner a reasonable business need. It is true, as the Board says, that this liquidation was not "inevitable"; unforeseen circumstances might arise to make it impracticable to liquidate the Jersey Company, and naturally enough, as against this contingency, Prince took pains to assure himself of the possibility of obtaining a renewal of the Jersey Company charter. But all the Government's experts, as well as the witnesses for petitioner, expressed the opinion that it was desirable to liquidate the Jersey Com-

---

[10] But the Government's own experts all agreed that petitioner should have made some further accumulations in the taxable years, the estimates varying from 30 to 66⅔ per cent. At the end of 1929 the total bonded indebtedness of the enterprise was $23,963,000, as against liquid assets (minus minimum working capital of $5,000,000) of $16,705,185.06— a spread of $7,257,814.94. At the end of 1933 the total bonded indebtedness of the enterprise was $21,197,000, as against liquid assets (minus minimum working capital of $5,000,000) of $12,829,900—a spread of $8,367,100, an increase of over $1,000,000. If all of petitioner's earnings had been paid out in dividends in the years 1930—1933, as the Board says ought to have been done, this adverse spread would have been further increased by many millions of dollars.

pany and the part of wisdom to provide for such liquidation. It was desirable in the interests of simplifying the corporate structure of the enterprise. The Jersey Company served no useful function, and remained as a superfluous intermediate holding company, vulnerable to taxation. There was a reasonable business need for petitioner to acquire sufficient of Jersey Company common and preferred stock to be able to control the Jersey Company's liquidation. As to the Jersey Company shares not acquired by petitioner, a prudent board of directors would consider the desirability of redeeming these shares otherwise than by a distribution of stock in the operating companies, so as to avoid possible embarrassment to petitioner's holding company operations by minority stockholders owning some of the stock of subsidiaries in the enterprise.

There is a necessary distinction, difficult to draw in a case like the present, between the corporation's reasonable business needs and the personal ambitions of Prince, its sole stockholder. It would be very nice for Prince to own a $60,000,000 "empire," as he called it, free of debt in 1940.[11] It is obvious that such an ambition might be more rapidly achieved by accumulation of profits in petitioner's treasury free of individual surtaxes on stockholders. But it would not necessarily be a reasonable need of petitioner, considered as a separate legal entity, to accumulate in the enterprise by 1940 liquid assets sufficient to pay off all the debts of the various companies, to buy up all the outstanding shares of Jersey Company common and preferred, and in addition to have a tidy working capital.

Granting that it may be a reasonable business need for a corporation to make provision for eventual extinguishment of all debts, the rate at which current profits should be accumulated for that purpose depends upon a variety of factors, including a forecast of the probable trend of future earnings and an estimate of the probability of putting through a partial refinancing on favorable terms on the dates when the various obligations mature. From 1923 through 1929 there was a steady decline totalling about $5,000,000 in the outstanding bonded indebtedness of the enterprise. The Central Manufacturing District bonds were serial bonds maturing annually, the last maturity date being March 1, 1941. The Chicago Junction Railroad Company bonds, which would have been worthless but for the guaranty of principal and interest by the Jersey Company, mature in 1945. The biggest maturity to be met in 1940 was the $14,000,000 issue of Jersey Company bonds. On December 31, 1929, the enterprise as a whole had on hand more than enough liquid assets to pay off this issue in full. That would release the valuable Transit Company stock and Railway Company stock pledged as collateral and open up to petitioner the possibility of putting out in 1940 a considerable new issue of bonds. Or petitioner might be able to raise additional capital in 1940 by an issue of preferred stock.[12]

These and other considerations would be in the minds of a reasonable board of directors in determining petitioner's dividend declarations for the taxable years now in question.

The Board's ultimate finding of forbidden purpose was predicated chiefly upon its findings that petitioner was a mere holding or investment company and that petitioner had accumulated its profits beyond the reasonable needs of the business, coupled with the fact that Prince saved a large amount of surtaxes by the withholding of further dividends.

---

[11] James A. McDonough, assistant to Prince, testified to a conversation he had with Prince some time in 1933:

"A. He said he was accumulating the stock of the New Jersey Company, and that he wanted to take and be in a position in 1940 where he would own all of the stock, that he could close up the company and liquidate it in 1940, and at that time he said he wanted $10,000,000 of working capital, free cash, in the till of the Maine Company to meet any emergencies that might arise.

\*    \*    \*    \*    \*    \*

"Q. Did he say anything about wanting it free of debt? A. Yes, sir. That was the principal theme; that in 1940 he wanted to have this entire property free of debt and $10,000,000 in cash in the treasury."

[12] This of course would be inconsistent with the personal ambition of Prince but ordinarily a corporation could not be said to have a reasonable business need of having all its stock held by one stockholder. See Williams Investment Co. v. United States, Ct.Cl.1933, 3 F.Supp. 225, 232. Prince could maintain his position as sole stockholder by subscribing out of his personal fortune to the whole of the new issue of preferred stock.

In addition, the Board pointed to the considerable loans which petitioner made to Prince from time to time, citing Helvering v. National Grocery Co., 1938, 304 U.S. 282, 293, 294, 58 S.Ct. 932, 82 L.Ed. 1346. The Board said: "There is no satisfactory explanation of why the petitioner did not make a dividend distribution to Prince of the funds which he needed." During 1930, one of the years in question, the net amount of the loans to Prince decreased by about $900,000. However, during the period 1930–1933 Prince's net debt to petitioner increased by $886,070, which increase was more than accounted for by the loan of $1,000,000 to Prince in 1933 to enable him to purchase a large block of stock in Armour & Company. This purchase, as indicated by the Board's finding which we have previously quoted, redounded to the benefit of petitioner. The significance of the loans to Prince is tied up with the question whether petitioner has accumulated profits beyond the reasonable needs of the business. If, on a proper view, such accumulations were deemed to be not unreasonable, this would suggest a possible reason why loans were made to Prince instead of increased dividends. The loans bore interest and were amply secured by a deposit of collateral, and hence did not impair petitioner's plan of accumulation. Of course, if there were no need of any further accumulation in 1933, the loan of $1,-000,000 to Prince in that year to enable him to buy his way into Armour & Company, instead of paying a dividend to him in that amount, would take on added significance.

In further support of its ultimate finding, the majority opinion stated:

"It furthermore appears that in 1931, 1932, and 1933 Prince sold securities to the petitioner for $120,193.21, $138,108.35, and $59,664, respectively, which enabled him to deduct from gross income in his income tax returns for those years losses of $196,124.68, $221,629.08, and $93,102.22, respectively, and in 1932 the petitioner sold to F. H. Prince & Co., Inc., which was organized by Prince on June 1, 1932, shares of the capital stock of the Stock Yards National Bank and of the Central Manufacturing District Bank, which enabled the petitioner to claim a deductible loss of $221,-202.03. The shifting of these securities from Prince to the petitioner and from the petitioner to Prince really meant no economic loss to Prince and the investment by the corporation of the amounts of money spent in acquiring the securities from Prince was not in furtherance of the program which Prince claims to have had for the corporation."[13]

This would not be an instance of using the corporation to save surtaxes "through the medium of permitting its gains and profits to accumulate." W. S. Farish & Co. v. Commissioner, 1938, 38 B.T.A. 150, 155, affirmed Commissioner v. W. S. Farish & Co., 5 Cir., 1939, 104 F.2d 833. All that happened was a change in the form of the accumulation. Here again, the transactions did not impair the plan of accumulation. At most, these transactions might be taken to indicate that Prince was not wholly unmindful of tax consequences nor averse on principle to minimizing taxes.

Since we hold that the Board committed errors of law in arriving at its main subsidiary findings, upon which its ultimate inference of forbidden purpose chiefly rested, the case should be remanded to the Board for further consideration of its findings and decision in the light of this opinion. When all is said and done, the Board will have before it the ultimate question whether petitioner has sustained the burden of proving that the Commissioner's determination was wrong, that is, whether the Board is satisfied on a preponderance of the evidence that in Prince's decision on behalf of petitioner to distribute no more than $400,000 in dividends in each of the taxable years, the forbidden motive of surtax avoidance played no substantial part.

The decision of the Board of Tax Appeals is vacated and the case is remanded to the Board for further proceedings not inconsistent with this opinion.

---

[13] In a supplemental order the Board added to its findings the following: "All of the securities sold by F. H. Prince & Co. to the petitioner in 1930, 1932 and 1933 were marketable securities and were sold to the petitioner at market price."